Francis L. **MIDDLETON**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 9341.

District of Columbia Court of Appeals.

Argued April 20, 1976.

Decided April 20, 1979.

W. Anthony Fitch, Public Defender Service, Washington, D. C., for appellant.

Peter E. George, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before GALLAGHER, HARRIS and MACK, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted in a jury trial of armed robbery, two counts of assault on a police officer while armed, and petit larceny.[1] D.C.Code 1973, §§ 22–2901, –3202; 22–505(b); and 22–2202. He alleges four grounds of error: (1) the trial court's incorporation of a notion of reciprocity in its administration of the discovery process; (2) the scope of his cross-examination by the prosecutor concerning a prior offense, and the court's response thereto; (3) the exclusion of expert testimony regarding the statistical frequency of his orthodontic configuration; and (4) the admission of in-court identification testimony by one of the assault victims who had been unable to identify appellant before their confrontation in the courtroom. While we conclude that the trial court erred in certain of its discovery rulings, we deem the error to be harmless. We find no merit in appellant's other contentions, and affirm his convictions.

I

At about 3:00 p. m. one afternoon, two men, one armed with a handgun, robbed a carryout shop in Northeast Washington. While the gunman held the customers and employees at bay, his companion jumped over the counter and rifled the cash register, placing the money in a white bag bearing the word "Cavalier." Minutes after the pair had fled the shop, Metropolitan Police Officers Larry Johnson and Timothy Wilson spotted a man matching the description

1. The original indictment charged appellant with armed robbery, robbery, petit larceny, carrying a pistol without a license, three counts of assault with a dangerous weapon, two counts of assault on a police officer while armed, and two counts of assault on a police officer. D.C.Code 1973, §§ 22–2901, –3202; 22–2901; 22–2202; 22–3204; 22–502; 22–505(b); 22–505(a). The trial court granted appellant's motion for a judgment of acquittal with respect to the charge of carrying a pistol without a license. The jury returned verdicts of guilty on the remaining ten counts. The charges of robbery, assault with a dangerous weapon, and assault on a police officer subsequently were dismissed as lesser-included offenses of the convictions of armed robbery and assault on a police officer while armed.

which they had heard on their radio at a bus stop several blocks from the scene of the robbery. The suspect was carrying a bag marked "Cavalier." When the officers approached the man, a struggle developed for the bag. The suspect's companion joined the fracas, and attempted to fire a pistol point-blank, first at Wilson and then at Johnson, but the weapon failed to discharge.[2] Although the two men managed to escape, the officers recovered the gun, the bag containing the cash from the shop, and a wallet belonging to one of the robbery victims. The next day Officer Johnson and one of the customers were shown an array of photographs; both identified appellant as the gunman.

A pretrial hearing was held at which two customers who had been in the shop at the time of the robbery and Officer Johnson described the relevant events and their respective identifications of appellant.[3] Following the testimony of one customer, Patricia Bennet, defense counsel made a request for any material which might be subject to the discovery provisions of the so-called Jencks Act. 18 U.S.C. § 3500 (1970). Although the government surrendered a number of documents (*see* footnote 5, *infra*), it countered with a request that the defense produce the report of its investigator who had interviewed several prospective government witnesses. The court, expressing a "doctrine of mutuality arising out of the Jencks Act," agreed that discovery should be reciprocal and declared that appellant's receipt of Jencks Act materials would be contingent on defense counsel's surrender of her investigator's report.

After the trial testimony of each of the affected witnesses, defense counsel renewed her requests for Jencks Act materials. (*See* footnote 7, *infra*). The court adhered to its previous order of reciprocity. Defense counsel persisted in her refusal to disclose the evidence obtained by the defense investigator, and the disputed documents were not exchanged. (*See* footnote 8, *infra*.) Bennet, Burton Powell, and Officer Johnson made in-court identifications of appellant. Their accounts of the robbery were corroborated by Joan Martin and Ellen Israel, two employees of the carryout who were unable to identify appellant.[4] Over objection by the defense, the court also permitted an in-court identification by Officer Wilson, who, until seeing appellant in the courtroom, had been unable to identify him as his bus stop assailant.

Appellant's theory of defense was misidentification. He presented three alibi witnesses—his mother, brother, and father—who testified to the effect that he had been at home at the time of the robbery. Defense counsel's proffer of expert testimony concerning the statistical frequency of appellant's orthodontic configuration (his teeth had been mentioned by several of the government's witnesses in their descriptions and identifications) was refused by the court. Finally, during appellant's direct testimony, defense counsel brought out the fact that appellant previously had pleaded guilty to a robbery charge in an unrelated assault. When the government thereafter probed the details of that extrinsic offense on cross-examination, defense counsel moved for a mistrial, but the court ruled that appellant had opened the door to

2. The .32 caliber pistol (containing five live rounds of ammunition) was found to have a broken firing pin.

3. Both Burton Powell, a customer who briefly had given chase to the offenders after the robbery, and Officer Johnson identified appellant from a photographic array the day after the incident. Powell, Johnson, and Patricia Bennet (another customer) each later identified appellant from a lineup photograph. At the conclusion of the hearing, the trial court ruled that the pretrial identification procedures had not been impermissibly suggestive, and denied ap-

pellant's motion to suppress. That ruling has not been challenged on appeal.

4. On the issue of identification, Martin testified that she was not sure. However, her account of the robbery tracked that of the other witnesses, and she identified both the Cavalier bag and the wallet which were recovered at the bus stop. Israel, called by the defense, briefly recounted the robbery and testified that she had been unable to give a good description of the assailants or to select a suspect from a photographic array.

the collateral incident. The jury ultimately returned a verdict of guilty on each of the charges.

## II

Appellant's first argument is that the trial court erred in its administration of the discovery process. Appellant sought the production of several documents in the possession of the government which were alleged to fall within the purview of the Jencks Act. The trial court, applying what it called "the doctrine of mutuality," concluded that appellant's right to those documents should be contingent on his surrender of a report by a defense investigator which purported to contain statements by several prospective government witnesses. When defense counsel refused to engage in reciprocal discovery, the court ruled that appellant had "forfeited" his right to the putative Jencks material.

The disputed rulings were in response to opposing discovery requests made during a pretrial hearing on appellant's motion to suppress certain identification testimony. The questioning of the first witness, Patricia Bennet, revealed the existence of material potentially falling within the provisions of the Jencks Act, and defense counsel sought production of the relevant documents for the purpose of cross-examining the witness. *See United States v. Anderson,* D.C.App., 366 A.2d 1098, 1105 (1976) (Harris, J., concurring); *see also United States v. Dockery,* D.C.App., 294 A.2d 158 (1972). The government did convey several documents to the defense.[5] However, before cross-examination of the witness re-

sumed, the prosecutor, who had learned that a defense investigator had obtained a statement from Patricia Bennet (as well as statements from Joan Martin and Ellen Israel), made a counter-request that the defense produce copies of those statements after each of those three witnesses testified.[6] Defense counsel resisted such discovery in reliance upon *United States v. Wright,* 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973). The trial court responded that *Wright* was not binding [see *M. A. P. v. Ryan,* D.C.App., 285 A.2d 310 (1971)], and announced that it would follow a principle of mutuality in resolving the discovery issues. The court rejected defense counsel's argument that neither Super.Ct.Cr.R. 16 nor the Jencks Act provided authority to compel the production of the disputed statements, and also rejected her assertion that to grant the prosecution's discovery request would both violate the doctrine of an attorney's "work product" and impinge on appellant's Fifth Amendment rights. The court concluded that the opposing discovery requests should be handled reciprocally, and declared:

> [S]o far as I'm concerned, [the defense] would have to make available the statement from Mrs. Bennet at this time from the doctrine of mutuality arising out of the Jencks Act . . . . [B]y declining to make available your statements, you forfeit your right to the Jencks Act materials.

On later occasions during both the pretrial hearing and the trial, appellant made further requests for Jencks material.[7] Much of the requested material was provid-

---

**5.** The government apparently provided copies of the rough notes taken by Detectives Collins and Clark in their initial interviews of the witnesses (including Bennet), as well as the robbery squad "write-up" and a transcript of the radio broadcast which led to the officers' original approach to the suspects.

**6.** The three women had been present during the commission of the robbery and were described as prospective government witnesses. At the trial on the merits, only Bennet and Martin testified for the government. Israel, who said

that she was unable to make any identification, was called as a witness for the defense.

**7.** In addition to the prior requests for Jencks material relevant to the testimony of Patricia Bennet, appellant sought to obtain the notes taken by the prosecutor during his interview of that witness [see *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976)], as well as the material relevant to the testimony of Burton Powell, Officer Johnson, Officer Wilson, and Joan Martin.

ed to the defense by the prosecution.[8] However, with respect to the three witnesses from whom the defense apparently had obtained statements, the trial court adhered to its theory of mutuality, and refused to compel production as long as appellant resisted reciprocal discovery.[9]

Appellant contends that the trial court erred (1) in ordering the surrender to the government of the statements obtained by the defense investigator; (2) by making appellant's rights under the Jencks Act contingent on his acquiescence in the government's request for discovery; and (3) by declining to apply the statutory sanctions to the government's nonproduction of its putative Jencks material.

█ We consider first the question of whether the trial court had the authority to order defense counsel (albeit on a reciprocal basis) to surrender to the government the evidence gathered by her investigator. Neither the Jencks Act nor Super.Ct.Cr.R. 16 provides for such discovery. The former is limited to discovery by a defendant of a narrow class of documents in the possession of the government after the declarant-witness has testified at trial. *See* 18 U.S.C. § 3500(b) and (e) (1970); *March v. United States,* D.C.App., 362 A.2d 691, 698 n. 9 (1976). There is nothing in either the language of the statute or its legislative history to suggest that Congress contemplated the creation for the government of a similar right of access to information in a defend-

ant's files. *See United States v. Wright, supra,* 160 U.S.App.D.C., at 65, 489 F.2d at 1189. Rule 16, on the other hand, does provide reciprocal pretrial discovery rights for the government, but only under limited circumstances. *See, e. g., United States v. Hodges,* 480 F.2d 229 (10th Cir. 1973). Moreover, the rule expressly excludes precisely the sort of evidence at issue in this case (*i. e.,* statements by potential witnesses). Super.Ct.Cr.R. 16(b)(2).[10] Thus, any authority which the trial court might have possessed to order the disclosure of evidence gathered by the defense investigator would have to be found elsewhere. *See United States v. Nobles,* 422 U.S. 225, 234–36, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *id.,* at 246, 95 S.Ct. 2160 (White, J., concurring).

The recognition of certain discovery rights for the government in criminal cases has been a fairly recent development. *See* 1 C. Wright, Federal Practice and Procedure: Criminal § 251 (1969). The caution with which both courts and legislatures have embraced the concept rests in large part on a proper respect for the Fifth Amendment's guarantee against self-incrimination. Additional inhibition stems from concern over the impact of prosecutorial discovery on such related matters as the Sixth Amendment's guarantee of effective assistance of counsel, the attorney-client privilege, and the so-called "work product" doctrine recognized in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451

---

**8.** Without court compulsion the government turned over to the defense many of the requested documents. The materials which were not given to the defense apparently consisted of the prosecutor's notes of his interviews of Patricia Bennet, the grand jury testimony of Joan Martin, and a summary of that testimony.

**9.** For example, the request for the Jencks material relevant to the testimony of Joan Martin (after she had testified on direct examination at the trial) produced the following colloquy:

THE COURT: All right, then, you can get the Jencks material that's set down with your word to produce the previous statement that you have with respect to this witness.

[DEFENSE COUNSEL]: Your Honor, I don't at this time wish to turn over the statement.

THE COURT: Then you don't get the Jencks material pursuant to my previous ruling.

**10.** Until recently, provision for reciprocal prosecutorial discovery was contained in Super.Ct. Cr.R. 16(c), which tracked the previous federal rule of the same number. In 1975, Fed.R. Crim.P. 16 was amended, with the provisions governing disclosure by the defendant being set forth in subsection (b). By an order dated September 24, 1976, this court approved several amendments to our local rules which included the restoration of substantive and numerical congruence between our Rule 16 and the current federal rule. *Cf. Campbell v. United States,* D.C.App., 295 A.2d 498, 501 (1972).

(1947).[11] *See, e. g., United States v. Nobles, supra,* 422 U.S., at 236–40, 95 S.Ct. 2160; *United States v. Wright, supra,* 160 U.S. App.D.C. at 64, 489 F.2d at 1188; *see also Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338 (1976). Appellant's challenge to the rulings by the trial court touches on each of these points.

■ The rationale offered by the trial court was one of a spirit of mutuality arising out of the Jencks Act. That statute, however, is no more than a narrowly structured scheme designed to regularize and limit the access of the accused to a specific type of evidence (*i. e.,* extrinsic statements or reports) which may facilitate the impeachment of the government's witnesses. *See Goldberg v. United States, supra,* 425 U.S., at 112, 96 S.Ct. 1338 (Stevens, J., concurring); *March v. United States, supra,* at 698. *See also United States v. Anderson, supra,* 366 A.2d at 1105 (HARRIS, J., concurring). While the Jencks Act does involve a certain balancing of interests, *i. e.,*

that of the accused in obtaining such material and that of the government in preserving the sanctity of its files and the safety of its officers and witnesses [*see Campbell v. United States,* 365 U.S. 85, 95, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *cf. Goldberg v. United States, supra,* 425 U.S. at 105–06, 96 S.Ct. 1338], its discovery provisions are directed unambiguously to the benefit of the defendant and contain no suggestion of mutual or reciprocal discovery. *See United States v. Wright, supra,* 160 U.S.App.D.C. at 65, 489 F.2d at 1189.

■ Perhaps what the trial judge may have had in mind was a redressing of the apparent gap between the provisions of the Jencks Act and the limited reciprocal discovery mechanism available under Rule 16. As noted, the rule expressly exempts from its discovery procedures access by either party to the type of evidence at issue in the case before us, *i. e.,* the extrinsic statements or reports of prospective witnesses.[12] *See*

11. We agree with the observation of the circuit court in *United States v. Perry,* 153 U.S.App. D.C. 89, 95, 471 F.2d 1057, 1063 (1972), that "the judicial process *is* a search for truth, not an adversary game." As the Supreme Court cautioned in *United States v. Nobles, supra,* 422 U.S. at 233, 95 S.Ct. 2160 the traditional generalization to the effect that criminal discovery is a "one-way street" is overly broad. The discovery process plays an essential role in the search for truth by exposing the weaknesses and inconsistencies of a witness' testimony. *See United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

We are also mindful, however, that in the criminal context the dimensions of discovery are strongly influenced by the additional concerns that the accused be secure from condemnations resting upon his coerced testimony or the improper annexation of his counsel's labors, and that the safety of the community not be jeopardized by unrestrained access to its prosecutor's files. These concerns, as well as proper deference to the constitutional principles which burden the state alone with proof of criminal charges, and considerations of fairness in light of the normal superiority of the government's investigatory resources, necessarily will frustrate the evolution of a parity of access similar to that embodied in the rules applicable to civil proceedings. *See United States v. Ross,* 511 F.2d 757, 762 (5th Cir.) *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *cf. United States v. Percevault,* 490 F.2d 126 (2d Cir. 1974); *United States v. Fratello,* 44 F.R.D.

444, 450–51 (S.D.N.Y.1968). Thus, for example, the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring the government to surrender upon proper request exculpatory material within its possession, does not generate the mutual and complimentary principle that the prosecution may draw upon the defendant's files for evidence favorable to the government's cause. *Cf. Levin v. Katzenbach,* 124 U.S.App.D.C. 158, 166, 363 F.2d 287, 295 (1966) (BURGER, J., dissenting).

12. Super.Ct.Cr.R. 16(b)(2) provides: "Except as to scientific or medical reports, this paragraph does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by government or defense witnesses, or by prospective government or defense witnesses, to the defendant, his agents or attorneys." *See* Rule 16(a)(2), imposing similar limitations on the evidence available for discovery by the defendant from the government.

Construing the similarly-worded provisions of the previous version of Rule 16, the Supreme Court concluded that they provided no basis for the government to discover a report filed by a defense investigator as the result of his interviews with prospective government witnesses. *United States v. Nobles, supra,* 422 U.S. at 234 n. 8, 95 S.Ct. 2160.

footnote 10, *supra. See generally,* 1 C. Wright, *supra,* § 251 *et seq.* While Rule 16 specifically defers to the Jencks Act for purposes of the defendant's discovery of such evidence, it is silent with respect to the alternative means, if any, by which the government may enjoy similar access to the exempted documents.[13] Notwithstanding the gap between the discovery mechanisms provided in Rule 16 and the Jencks Act, those two schemes represent careful attempts to balance the competing interests of society and the accused in a manner consistent with the objective of truth while being faithful to the mandate of the Constitution, and any venture beyond their limited principles must be subjected to close scrutiny.[14] *See generally United States v. Percevault,* 490 F.2d 126 (2d Cir. 1974); *cf. United States v. Fratello, supra,* 44 F.R.D. at 450–51. Both the importance of the interests at stake in any expansion of the prosecutor's right to discover a defendant's evidence and the need for a broad perspective from which to assure the proper consistency among the various rules and systems of discovery argue in favor of deferring any such modification to the appropriate legislative forum. *See United States v. Wright, supra,* 160 U.S.App.D.C. at 68, 489 F.2d at 1192. *Cf. United States v. Anderson, supra,* 366 A.2d at 1104–05 (HARRIS, J., concurring); *March v. United States, supra,* 362 A.2d at 698–702.

Apart from the lack of statutory authority, we find little in the relevant case law to support the trial court's determination to expand the government's discovery rights. In *United States v. Wright, supra,* the circuit court concluded that the principles of both the statutory discovery mechanism and the Fifth Amendment precluded the compelled production of a report prepared by a defense investigator from his interviews of potential witnesses. In *Wright,* the investigator had been called to the stand to impeach the testimony of certain government witnesses. Here we are not confronted with the additional factor of the substantive use by the defense of either the testimony of its investigator or the evidence which he had gathered.[15] Thus, it would

Moreover, in addition to narrow restrictions on the types of evidence which may be discovered by the government under Rule 16, such rights as do exist do not arise unless and until the defendant has requested discovery of items falling within Rule 16(a)(1)(C) or (D), *i. e.,* "Documents [other than 'statements'] and tangible objects," or "reports of examinations and tests." Rule 16(b)(1).

13. The gap between the two discovery schemes is aggravated by the fact that their remedies become available at different times in the course of the criminal adjudication. *See, e. g., United States v. Treatman,* 399 F.Supp. 264, 267 (W.D.La.1975). Discovery under Rule 16 is limited to the pretrial context. Thus, even were the evidence at issue not exempted from its provisions, the authority to compel production after the trial has commenced must be found outside the rule. *See United States v. Nobles, supra,* 422 U.S. at 234–36, 95 S.Ct. 2160.

The Jencks Act, on the other hand, will not support orders for discovery in the pretrial context, as disclosure may not be compelled until the affected declarant-witness "has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a) (1970). *See March v. United States, supra,* at 698–99; *cf. United States v. Percevault,* 490 F.2d 126, 132 (2d Cir. 1974). This court has recognized a limited expansion of its provisions to govern the situation where the affected witness has given testimony for the government which is critical to the resolution of a pretrial motion to suppress tangible evidence. *United States v. Dockery, supra.* However, under normal circumstances, the pretrial application of the statutory principles must be confined to a proper determination of the existence of potential Jencks material and voluntary discovery, with the authority necessary for a coercive order of production to await the trial testimony of the particular declarant-witness. *See United States v. Anderson, supra,* 366 A.2d at 1104–05 (HARRIS, J., concurring).

14. In *United States v. Spagnuolo,* 515 F.2d 818, 821 (9th Cir. 1975), the court observed: "The purpose of the Jencks Act is to restrict judicial power to order discovery against the government in criminal cases. * * * This purpose would be frustrated if district courts could compel disclosure, contrary to the Jencks Act, in the exercise of their discretion over cross-examination. Although district courts have wide latitude in ordering discovery in criminal cases . . . we cannot tamper with statutory restrictions upon their power."

15. While the *Wright* court observed that had the investigator used his report to refresh his recollection for his in-court testimony, the prosecution might obtain those portions relevant to impeachment (*cf.* Fed.R.Evid. 612), it

appear that but for the doctrine of *M. A. P. v. Ryan, supra,* the conclusion in *Wright* would bar the disputed discovery.[16] *See United States v. Brown,* 501 F.2d 146 (9th Cir. 1974), *rev'd sub nom. United States v. Nobles, supra.*

The Supreme Court's decision in *United States v. Nobles, supra,* however, casts considerable doubt on the rationale if not the result reached by the *Wright* court. In *Nobles,* the Court sustained a ruling by the trial court making the testimonial use of a defense investigator (for the purpose of impeaching a government witness) contingent on the submission of the investigator's report to the court for *in camera* inspection and transmittal to the government of those portions relevant to the attempted impeachment. As in the instant case, the discovery was challenged on the grounds that it conflicted with the statutory discovery mechanisms and contravened the principles of the

work product doctrine as well as the guarantees of the Fifth and Sixth Amendments.[17] The Court rejected those claims, and emphasized that despite the adoption of statutory mechanisms such as the Jencks Act and Rule 16, trial courts retain their "inherent powers" over the discovery process.[18] In proper circumstances, those powers may support the compelled production of previously recorded witness statements in the possession of the defense.[19] The question for our determination thus becomes whether, despite the lack of statutory authority, the disputed discovery may be sustained as an exercise of the "inherent powers" recognized in *Nobles.* We conclude that it may not.

■ Central to the *Nobles* Court's rationale with respect to the arguments concerning the principles of the Sixth Amendment and the work product doctrine was the fact

found the wholesale discovery of the entire report impermissible. 160 U.S.App.D.C. at 65, 489 F.2d at 1189. (The report contained information concerning witnesses other than the targets of the investigator's impeachment testimony.) In the instant case, the disputed rulings suffered from similar overbreadth, for the trial court made no attempt to confine the discovery process to material relevant to the in-court testimony of the declarant-witnesses and the impeachment thereof. *See United States v. Nobles, supra,* 422 U.S. at 240, 95 S.Ct. 2160.

16. The trial court properly recognized that pursuant to the principles enunciated in *M. A. P. v. Ryan, supra,* decisions by the circuit court announced after the effective date of the court reorganization, while entitled to "great respect," are not binding on the courts of the District of Columbia. *See Bethea v. United States,* D.C.App., 365 A.2d 64, 70–72 (1976).

17. The Ninth Circuit, relying on *United States v. Wright, supra,* had held the trial court's ruling erroneous as contravening both the principles of Rule 16 and the constitutional guarantee against self-incrimination. *United States v. Brown, supra. But see id.,* at 160 (KILKENNY, J:, dissenting in part, distinguishing *Wright* ).

18. The rationale in *Wright* appears to conform to the Court's earlier pronouncements in *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). There the Court held that "statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500, 18 U.S.C.A. 3500, cannot be

produced at all." 360 U.S. at 351, 79 S.Ct. at 1224. The Court also stated:

To be sure, [the Jencks Act] does not, in so many words, state that it is the exclusive, limiting means of compelling for cross-examination purposes the production of statements of a government witness to an agent of the Government. But some things too clearly evince a legislative enactment to call for a redundancy of utterance. [360 U.S. at 350, 79 S.Ct. at 1223.]

Mr. Justice BRENNAN, concurring in the result, objected to this "stripping" of the trial courts' traditional discretionary authority over discovery. 360 U.S. at 361, 79 S.Ct. at 1217. The *Nobles* Court apparently was of the same sentiment, for his criticism was among the authorities cited for its recognition of the trial court's "inherent" discovery powers. 422 U.S. at 231, 95 S.Ct. 2160.

19. The *Nobles* Court framed the issue in the following manner:

Decisions of this Court repeatedly have recognized the federal judiciary's inherent power to require the prosecution to produce the previously recorded statements of its witnesses so that the defense may get the full benefit of cross-examination and the truth-finding process may be enhanced. . . . At issue here is whether, in a proper case, the prosecution can call upon that same power for production of witness statements that facilitate "full disclosure of all the [relevant] facts." [422 U.S. at 231, 95 S.Ct. at 2167; citations omitted.]

that the investigator in that case had been called as a witness for the defense. The Court acknowledged the general applicability of the qualified privilege recognized in *Hickman v. Taylor, supra,* to the investigator's report.[20] Nonetheless, it concluded that by placing its agent on the stand and making testimonial use of the disputed evidence, the defense voluntarily had waived whatever protection might have been available under the doctrine.[21] 422 U.S. at 236–40, 95 S.Ct. 2160. *See also Randall v. United States,* D.C.App., 353 A.2d 12, 12 n. 2 (1976); *cf. Moore v. United States,* D.C. App., 353 A.2d 16, 28 n. 5 (1976) (HARRIS, J., dissenting). Similarly, the Court found

that the defense's election to make substantive use of the agent and his evidentiary product disposed of the claim that the challenged discovery impermissibly impinged on the Sixth Amendment guarantee of effective assistance of counsel.[22] 422 U.S. at 240 n. 15, 95 S.Ct. 2160. *Cf. United States v. Washabaugh,* 442 F.2d 1127, 1129 (9th Cir. 1971). The facts of the instant case, however, reveal no such waiver of the *Hickman v. Taylor* and Sixth Amendment protections, as the investigator was not called as a witness and appellant did not attempt to make substantive use of the disputed report.[23]

20. Quoting Mr. Justice Jackson's statement in *Hickman v. Taylor* that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," the Court concluded: "It is . . . necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." 422 U.S. at 238–39, 95 S.Ct. at 2170 (footnote and citations omitted). Thus, contrary to the trial court's opinion that the work product doctrine is "an old, outmoded concept," its principles remain relevant to the discovery process. *See* 422 U.S. at 238 n. 12, 95 S.Ct. 2160.

We do not read *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338 (1976) (holding that the work product doctrine does not bar discovery of materials otherwise producible under the Jencks Act), as suggesting a contrary conclusion. There the Court declared that "the primary policy underlying the work-product doctrine—*i. e.,* protection of the privacy of an attorney's mental processes . . . is adequately safeguarded by the Jencks Act itself." *Id.,* at 106, 96 S.Ct. at 1346 (citation omitted). It explained *(ibid.):*
> Proper application of the Act will not compel disclosure of a Government lawyer's recordation of mental impressions, personal beliefs, trial strategy, legal conclusions, or anything else that "could not fairly be said to be the witness' own" statement. "If a government attorney has recorded only his own thoughts in his interview notes, the notes would seem both to come within the work product immunity and to fall without the statutory definition of a 'statement.'" [Quoting *Saunders v. United States,* 114 U.S.App.D.C. 345, 349, 316 F.2d 346, 350 (1963). *See United States v. Smaldone,* 484 F.2d 311, 315–18 (10th Cir. 1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974).]

Nor do we agree with appellant's suggestion that the disputed rulings conflicted with the principles of the attorney-client privilege. The

protections afforded by that doctrine are both distinct from those available under *Hickman v. Taylor* and somewhat more narrow. *United States v. Nobles, supra,* 422 U.S. at 238 n. 11, 95 S.Ct. 2160. As the *Hickman* Court explained, "the protective cloak of [the attorney-client] privilege does not extend to information which the attorney secures from a witness while acting for his client in anticipation of litigation." 329 U.S. at 508, 67 S.Ct. at 392. *See Daniels v. Hadley Memorial Hospital,* 68 F.R.D. 583, 585–86 & nn. 2, 3 (D.D.C.1975).

21. Mr. Justice WHITE, writing in concurrence, found the waiver analysis unnecessary, as he viewed the qualified privilege of the work product doctrine to be a restraint on pretrial discovery alone. He agreed, however, that the challenged discovery order fell within the court's inherent discretionary authority over evidentiary matters arising in the context of the actual trial. 422 U.S. at 242–54, 95 S.Ct. 2160.

22. The Court also stressed the need to protect the trier from "half-truths" and pointed to the limited and conditional nature of the challenged order, suggesting that the speculative impact of the discovery on the defense did not attain constitutional significance. 422 U.S. at 240–41 & n. 15, 95 S.Ct. 2160.

23. The *Nobles* Court explained: "What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents." 422 U.S. at 239 n. 14, 95 S.Ct. at 2171.

There exist additional important distinctions between the case before us and the situation in *Nobles* in terms of both the need for and the scope of the disputed discovery. Apart from the matter of waiver, the *Nobles* Court found the testimonial use of the defense investigator significant for its potential effect on the integrity of the adjudicatory process. It emphasized the trial context of the challenged discovery, noting that what was at stake there was not merely the facilitation of the movant's preparation for trial or his ability to impeach his opponent's witnesses, but whether the trier would be provided with the full and fair exposition of the facts necessary to a proper resolution of the merits of the case. 422 U.S. at 231–32, 95 S.Ct. 2160. *Cf. United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 309 (1974); *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Because Nobles had chosen to use the material gathered by his investigator as substantive evidence and not merely as a foundation for impeachment, the Court concluded:

> The investigator's contemporaneous report might provide critical insight into the issues of credibility that the investigator's testimony would raise. [422 U.S. at 232, 95 S.Ct. at 2167.]

> \* \* \* \* \* \*

> [I]t was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent . . .. 422 U.S. at 241, 95 S.Ct. at 2171.]

Here there was no such compelling need, for the challenged ruling first was made in the pretrial context, and there is no indication that appellant intended to use the requested materials other than as providing a basis for defense counsel's cross-examination of the government's witnesses.

 In upholding the challenged discovery, the *Nobles* Court also emphasized the reasonableness of the required disclosure. *See* 422 U.S. at 240, 95 S.Ct. 2160. Unlike the sweeping directive of the trial court in this case that appellant surrender directly to the prosecution "any information . . . which sheds light on the substantial merits [of the] case," the trial court in *Nobles* had confined its order to the production of the requested documents for *in camera* inspection, with the government to receive only those portions, if any, relevant to the matters raised by the actual testimony of the affected witnesses.[24] *See* 422 U.S. at 228–29, 240–41, 95 S.Ct. 2160. *See also United States v. Wright, supra,* 160 U.S. App.D.C., at 65, 489 F.2d at 1189. As measured against the *Nobles* rationale, we are of the opinion that the absence of any waiver of the relevant privileges and the combined effect of a less compelling need and a substantially greater intrusion into the affairs of appellant and his counsel fail to provide the proper circumstances which would be necessary to sustain the disputed discovery as an exercise of the trial court's "inherent powers."

Finally, even were we able to conclude that despite the lack of statutory authority the trial court nevertheless might create a reciprocal of the Jencks Act inuring to the government's benefit, we note that the actual effect of the disputed rulings was to grant the government a far broader degree of discovery than that contemplated by the statute. Under the Act, a defendant is entitled to only those documents found to be "statements" within the meaning of 18 U.S.C. § 3500(e) (*see March v. United States, supra,* 362 A.2d at 698), and may not obtain such materials until after the declarant has testified (and then only to the extent that they are relevant to the witness'

---

**24.** The Supreme Court explained: "[T]he District Court properly exercised its discretion in this instance. The court authorized no general 'fishing expedition' into the defense files or indeed even into the defense investigator's report. . . . Rather, its considered ruling was quite limited in scope, opening to prosecu-

tion scrutiny only the portion of the report that related to the testimony the investigator would offer to discredit the witnesses' identification testimony." 422 U.S. at 240, 95 S.Ct. at 2171 (citation omitted). *Compare* 18 U.S.C. § 3500(c) (1970).

testimony).[25] 18 U.S.C. § 3500(a) and (b) (1970); *see United States v. Anderson, supra,* 366 A.2d at 1104–05 (HARRIS, J., concurring). Here the original order was made at the suppression hearing and indiscriminately embraced all of the investigator's work product pertaining to the "merits of the case," despite the fact that at that time only one of the affected witnesses had given any testimony.[26] *Compare United States v. Wright, supra,* 160 U.S.App.D.C. at 65, 489 F.2d at 1189. We do not view the trial court's apparent willingness to extend similarly liberal discovery to appellant as significant. However appealing the notion of full disclosure may be in the abstract, important constitutional and societal interests affected by the criminal discovery process counsel against a casual acceptance of such a major revision of the established statutory schemes.[27] For the foregoing rea-

25. In an attempt to sort out the difficult issues raised by appellant's broad challenge to the trial court's discovery orders, we have set aside several questions concerning the timing of those orders. We do not mean to suggest, however, that such matters are inconsequential, for under the statutory discovery schemes the question of when discovery may be had is no less vital than that of determining what materials are subject to compelled disclosure. *See United States v. Anderson, supra,* 366 A.2d at 1103–10 (HARRIS, J., concurring).

Here the initial requests and the order of reciprocal discovery were made in the pretrial phase of the case (at which time the only witness who had testified was Patricia Bennet). By the express language of the Jencks Act, appellant was not yet entitled to receive whatever materials might fall within the scope of subsection (e) of the Act. *See* 18 U.S.C. § 3500(b). (As noted above, Rule 16 is inapplicable to the type of evidence at issue and therefore would provide no authority for an order of discovery regardless of the timing.) At the time of the original requests, it is doubtful that the court had the power to compel the production of documents containing the previous "statements" (if any) of that witness [*see United States v. Anderson, supra,* at 1103–10 (HARRIS, J., concurring); *compare United States v. Dockery, supra* ], and it clearly had no authority to order the production of materials pertaining to witnesses who as yet had given no testimony. *See United States v. Spagnuolo,* 515 F.2d 818, 820 (9th Cir. 1975); *United States v. Curran,* 498 F.2d 30, 36 (9th Cir. 1974); *Sendejas v. United States,* 428 F.2d 1040, 1045–46 (9th Cir.), *cert. denied,* 400 U.S. 879, 91 S.Ct. 127, 27 L.Ed.2d 116 (1970); *United States v. Montos,* 421 F.2d 215, 220–21 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). *See also Palermo v. United States, supra,* 360 U.S. at 353–54 n.11, 79 S.Ct. 121; *United States v. Harris,* 458 F.2d 670, 679 (5th Cir.), *cert. denied sub nom. Scott v. United States,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972); *United States v. Brown,* 425 F.2d 1172, 1174 (9th Cir. 1970). In this connection it should be noted that in recognizing the trial court's inherent power to order disclosure, both the *Nobles* majority and Mr. Justice WHITE in

concurrence emphasized the trial context of the challenged discovery.

Although appellant made further requests as the trial progressed, the court perfunctorily adhered to its initial ruling. *See* footnote 9, *supra*. As each of the affected witnesses testified on direct examination, appellant's discovery rights with respect to that witness "ripened" in the sense that at that time the court should have responded *to defense counsel's motions* by making a particularized determination as to whether any of the materials pertaining to that witness contained evidence falling within subsections (b) and (e) of the Act. *Cf. Goldberg v. United States, supra,* 425 U.S. at 105, 96 S.Ct. 1338. Its failure to do so was error. *See id.,* at 108 -12. *See also United States v. Anderson, supra,* 366 A.2d at 1106–07 (HARRIS, J., concurring).

26. On the facts before us, the incongruency between the Jencks Act and any notion of reciprocity is further demonstrated by the fact that while the purpose of the Act is to facilitate the impeachment of opposing (*i. e.,* government) witnesses [*see March v. United States, supra,* 362 A.2d at 698; *cf. Jencks v. United States,* 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957)], the disputed discovery was for the purpose of providing the prosecution with statements of its own witnesses, whom it normally would neither seek nor be permitted to impeach (or to buttress their testimony, should the materials contain prior consistent statements). *Cf. Palermo v. United States, supra,* 360 U.S. at 353 n.10, 79 S.Ct. 1217; *Matthews v. United States,* 407 F.2d 1371, 1376 (5th Cir. 1969). *Compare* Fed.R.Evid. 607 (1975).

27. We have found only one federal decision involving the judicial creation of a Jencks Act reciprocal. *United States- v. Pulvirenti,* 408 F.Supp. 12 (E.D.Mich.1976).– *Compare United States v. Wright, supra. Cf. People v. Damon,* 24 N.Y.2d 256, 299 N.Y.S.2d 830, 834–35, 247 N.E.2d 651, 654 (1969). There the material at issue was extrinsic statements obtained by the defense from certain of its alibi witnesses [*cf.* Fed.R.Crim.P. 12.1], and the district court cited *Nobles* as authority for its innovation. Quite apart from our reservations concerning the wisdom of (and authority for) such a major change in the established principles of criminal

sons, we conclude that the court erred in ordering defense counsel to provide the government with the evidence gathered by her investigator.[28] *See Craig v. Superior Court,* 54 Cal.App.3d 416, 126 Cal.Rptr. 565 (1976). Moreover, the trial court also erred in conditioning appellant's discovery of material to which he was entitled under the Jencks Act upon his compliance with that directive.

These conclusions, however, do not end our inquiry. We are left to determine whether these errors prejudiced appellant in a manner requiring reversal (or a remand for renewed trial court consideration of the Jencks Act questions) or whether, as the government asserts, they were harmless under the standard announced in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[29]

 As we have said (see footnote 8, *supra*), the materials not provided to appellant at trial included the prosecutor's notes of his interviews with the witness Patricia Bennet and the grand jury testimony of the witness Joan Martin. We have reviewed the notes of the interviews with Bennet. Unquestionably, as noted by the Supreme Court in *Rosenberg v. United States,* 360 U.S. 367, 369, 79 S.Ct. 1231, 1233, 3 L.Ed.2d 1304 (1959), they "in no sense complied with subsection (e) of the statute. They were neither signed nor otherwise adopted by [the] witness . . . nor were they reproductions as statutorily required of any statement made by [the] witness at the

---

discovery, we note that unlike what occurred in the instant case, the *Pulvirenti* court was careful to limit its order to a surrender of the disputed evidence for its *in camera* scrutiny, with only those items both satisfying the statutory definition of a "statement" and relevant to the direct testimony of the declarant-witness to be passed on to the prosecution for use in cross-examination. *See United States v. Nobles, supra,* 422 U.S. at 240, 95 S.Ct. 2160.

**28.** We have not overlooked appellant's claim that the disputed rulings also were defective as contravening the principles of the Fifth Amendment. In *Nobles,* an argument based on the guarantee against self-incrimination was rejected on the ground that the guarantee is personal to the individual and does not preserve all private information. The Court concluded that without more, communications between a defense investigator and a third party who is called as a witness do not fall within the sphere of constitutional protection. 422 U.S. at 233–34 & n.7, 95 S.Ct. 2160.

Apart from the question of self-incrimination, however, appellant raises the related point that the challenged discovery impermissibly infringed his Fifth Amendment right to a fair trial. It does appear at least theoretically possible that at some point there might exist a conflict between requiring the state to assume the full burden of establishing the charged offense and the continued expansion of prosecutorial discovery. *See United States v. Wright, supra,* 160 U.S.App.D.C. at 71, 489 F.2d at 1195; *cf. In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). However, we need not reach this complex issue. *See Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (suggesting that the principal due process concern in the discovery process is

the notion of reciprocity). *See also United States v. Nobles, supra,* 422 U.S. at 233, 95 S.Ct. 2160. In this connection, for a discussion of the relationship of the Jencks Act to the due process principles enunciated in *Brady v. Maryland, supra,* see *United States v. Scott,* 524 F.2d 465 (5th Cir. 1975); *United States v. Harris, supra,* at 675–77. *See also March v. United States, supra,* 362 A.2d at 700–01 & nn. 14, 17; *Moore v. United States, supra,* 353 A.2d at 21–28 (HARRIS, J., dissenting).

**29.** The Supreme Court has instructed that the statutory discovery principles of the Jencks Act are not to be considered constitutional dogma. *United States v. Augenblick,* 393 U.S. 348, 355–56, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Palermo v. United States, supra,* 360 U.S., at 362, 79 S.Ct. 1217. Accordingly, the appropriate standard is that provided by the Court in *Kotteakos v. United States.* There the Court said:

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is in grave doubt, the conviction cannot stand. [328 U.S. at 764–65, 66 S.Ct. at 1248 (footnote and citation omitted).]

trial." [30] On the other hand, the grand jury testimony of the witness Martin certainly met the requirements of the Act. 18 U.S.C. § 3500(e)(2) (1970). *See United States v. Eisenberg,* 469 F.2d 156, 160 (8th Cir. 1972), *cert. denied,* 410 U.S. 992, 93 S.Ct. 1515, 36 L.Ed.2d 190 (1973). Thus, that transcript was producible under the Jencks Act.

In a case free of error, appellant's timely requests for that material presumably would have resulted in a trial court directive under either 18 U.S.C. § 3500(b) or (c) that the grand jury transcript be made available to the defense. The government then would have been required to decide whether to comply in full, in part, or at all with that order. Under 18 U.S.C. § 3500(d), noncompliance would mandate that the trial court strike the testimony of the government witness in connection with whom— and to the extent that—the Jencks Act production order was refused. [31]

■■■ The government urges that any error was harmless because the material withheld from the defense prevented neither effective cross-examination nor the full presentation of appellant's alibi and mistaken identity defenses. Of course, the harmless error concept is applicable in appropriate situations to Jencks Act cases. *See, e. g., Rosenberg v. United States, supra,* 360 U.S. at 371, 79 S.Ct. 1231; *Hardy v. United States,* D.C.App., 316 A.2d 867, 870–71 (1974); *United States v. Knight,* 166 U.S.App.D.C. 21, 25, 509 F.2d 354, 358 (1974). Such a conclusion validly could be reached in this case; the transcript of the grand jury testimony of Joan Martin was only five pages in length and it was fully consistent with her trial testimony. [32] *See Wiggins v. United States,* D.C.App., 386 A.2d 1171, 1174–75 (1978). However, notwithstanding the simplicity of the testimony at issue in this case, we prefer not to rely solely on such an analysis; we share the Supreme Court's concern that an "appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled." *Rosenberg v. United States, supra,* 360 U.S. at 371, 79 S.Ct. at 1234. Hence, for purposes of analysis, we eschew a harmless error holding based upon our review of the transcripts, and assume that the government's nonproduction of Mrs. Martin's grand jury testimony should have resulted in the striking of her testimony. To determine whether the trial court's failure to do so caused reversible prejudice to appellant, we must decide whether it is likely that the jury's verdict was substantially swayed by the impact of the testimony.

Viewing the testimony of the witness Martin in the context of the exceptionally strong case against appellant adduced from the testimony of the other witnesses, we conclude that the trial court's presumably erroneous nonstriking of her testimony was harmless, as *Kotteakos* contemplates that term.

The case against appellant was strong. Burton Powell, a customer in the sandwich

---

30. We note, however, that unquestionably the Jencks Act contemplates the potential production of a prosecutor's notes of an interview with a government witness. *See Goldberg v. United States, supra.* However, to be producible such notes must both satisfy the statutory definition of a "statement" and have relevance to the trial testimony of the declarant. *Cf. March v. United States, supra,* 362 A.2d at 697–702.

31. 18 U.S.C. § 3500(d) alternatively empowers the trial court to declare a mistrial if the interests of justice so require.

32. The cross-examination of Mrs. Martin by defense counsel during the trial was one-half page in length; it was as follows:

Q. Mrs. Martin, I show you . . . a photograph of a lineup. Were you shown this photograph in [the prosecutor's] office in October?

A. Yes.

Q. At that time were you able to identify anyone in that picture?

A. No.

Q. Thank you. And you felt at the time when the man with the gun entered the store that he was a regular customer of the store?

A. Yes.

[Defense counsel]: I have no further questions.

shop, testified that he had an excellent opportunity to observe the robbers and that he had briefly given chase as the robbers fled. He recalled that the perpetrators put the proceeds of their crime in a white bag with a red and black circular design and the name "Cavalier" at the bottom. On the day after the robbery, Powell viewed a collection of slides and identified appellant's photograph as that of one of the robbers. Although confused and unable to select appellant from a lineup, Powell later identified him from a photograph of that lineup, and identified him once more in court.

Police officers Johnson and Wilson responded to a radio run of the robbery, and within minutes of the crime spotted an individual fitting the physical description of one of the robbers standing at a bus stop just four and one-half blocks from the sandwich shop. The suspect was carrying a "Cavalier" bag, and stepped back as Officer Johnson approached him. A struggle ensued; the officer observed another individual with a gun standing nearby. That individual attempted unsuccessfully to shoot both officers at point-blank range. Officer Johnson identified him from a slide series, a lineup, a lineup photograph, and at trial as appellant. Officer Wilson was unable to make a pretrial photographic identification, but positively identified appellant at trial as the gunman. (This had been his first opportunity to observe appellant in person since the day of the robbery.) Officer Wilson recalled at trial that he had observed the gunman face-to-face for five or ten seconds at a distance of approximately three feet. Testimony further established that following their altercation with the officers, the suspects escaped, with the officers unsuccessfully giving chase. The officers recovered appellant's gun, the "Cavalier" bag containing the robbery loot, and a wallet belonging to Joan Martin, the manager of the sandwich shop.

We have no doubt that a jury reasonably could have convicted appellant based on the testimony of Burton Powell and Officers Johnson and Wilson. Viewed in context, Martin's testimony was relatively inconsequential. She was unable at any time to identify either of the robbers. She did corroborate testimony of other witnesses that a "Cavalier" bag was used, and she identified her empty wallet which was recovered by police from the perpetrators. In our view, it is inconceivable that the testimony of Mrs. Martin substantially influenced a jury which also heard and could properly consider the testimony of Burton Powell and Officers Johnson and Wilson. The fact that the testimony in question was not stricken does not lead either to reversal or to a remand for further proceedings on the discovery issue.

### III

Appellant's second argument challenges the prosecutor's cross-examination concerning his prior conviction for robbery. The subject of the previous offense was first broached by the defense on direct examination. After establishing that on the day in question appellant had visited his parole officer, defense counsel asked:

[DEFENSE COUNSEL]: Why are you on probation?

[APPELLANT]: I snatched a lady's pocketbook.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Did you plead guilty or did you go to trial?

[APPELLANT]: I plead guilty.

[DEFENSE COUNSEL]: Why aren't you pleading guilty in this case?

[APPELLANT]: Because this isn't my charge, and I don't know nothing about it. This isn't my beef.

At that point the trial court, sua sponte, cautioned the jury that such testimony could be considered only for the purpose of evaluating appellant's credibility, and not on the question of guilt. Thereafter, on cross-examination, the following exchange took place:

[PROSECUTOR]: Now, you said . . that this wasn't your beef, those were your words?

[APPELLANT]: Right.

\* \* \* \* \* \*

[PROSECUTOR]: Now, you were convicted of a robbery in 1972, is that right?

[APPELLANT]: Right.

[PROSECUTOR]: Now, when you said you plead guilty to that, to taking a woman's purse, isn't it a fact that you struck a woman in the face and took her purse?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Objection overruled. You went into the facts of the offense

. . . .

[PROSECUTOR]: Isn't it a fact that, Mr. Middleton, that you struck a 58 year old woman in the face and snatched her purse and ran for two blocks? Is that the reason why you plead guilty to the case, because you were caught red-handed with the purse in your hand? With the woman's purse one block away? Isn't that why you plead guilty?

[APPELLANT]: No.

At the close of cross-examination, defense counsel moved for a mistrial. The court denied the motion on the ground that the direct examination had opened up not only the subject of appellant's prior conviction but the motivation behind his plea of guilty as well. While the court suggested that such a line of inquiry had been improper in the first place, it concluded that once the matter had been placed before the jury by the defendant, he could not thereafter complain of further exploration on cross-examination. The trial judge stated:

THE COURT: You used [the direct examination] to indicate to the jury that he had not plead guilty in this case, as he wasn't guilty, whereas he had been guilty, apparently trying to correct [create?] the impression of the jury that if he had been guilty, he would have plead guilty in this case as he did before. I feel that [the cross-examination] is wholly and completely proper. . . .

The court also declined a request that the jury be reinstructed on the proper use of the disputed testimony. Appellant now argues that both the scope of the prosecutor's cross-examination and the trial court's response to his objections thereto amount to reversible error. We disagree.

It is the law in this jurisdiction that, as with any other witness, when the defendant elects to take the stand he may be impeached by evidence of his prior convictions. D.C.Code 1973, § 14–305. *Cf.* Fed.R.Evid. 609 (1975). Because of the potential impact of such evidence upon the trier of fact, it is not uncommon for defense counsel to attempt to forestall the government's detrimental use of the previous offenses by raising the subject during the direct examination of the accused, and we have sanctioned that practice. *See Kitt v. United States,* D.C.App., 379 A.2d 973 (1977). As appellant suggests, such a tactic is not inconsistent with the principle which permits the accused to give a limited explanation of extrinsic convictions when the subject is first broached by the government. *See United States v. Boyer,* 80 U.S.App. D.C. 202, 150 F.2d 595 (1945); *see also Jenkins v. United States,* D.C.App., 374 A.2d 581 (1977). *Compare Brooks v. State,* 24 Md.App. 334, 330 A.2d 670, 675 (1975).

It does not follow, however, that the defense is subject to no restrictions on its use of prior convictions. It is well settled that as a general matter such evidence is admissible only as bearing on the issue of the witness' credibility, and must not be allowed improperly to influence the determination of guilt. *See, e. g., United States v. Henry,* 174 U.S.App.D.C. 88, 93–95, 528 F.2d 661, 666–68 (1976). Thus, for example, courts have been quick to find error where the manner in which the government employs evidence of prior offenses exceeds the bounds of proper impeachment and fatally infects the ultimate issue. *See, e. g., Fields v. United States,* D.C.App., 396 A.2d 522, 526–28 (1978); *United States v. Henry, supra,* 174 U.S.App.D.C. at 93–95, 528 F.2d at 666–68; *United States v. Carter,* 157 U.S. App.D.C. 149, 151–52, 482 F.2d 738, 740–41 (1973). Here the record clearly portrays an attempt by the defense to use the evidence of the purse-snatching (*i. e.,* appellant's prior guilty plea) to create an inference of innocence with respect to the charges in the present case. The appeal of such a strateg-

em lies in the difficulty faced by the government in responding to the proffered inference without creating the impermissible suggestion that the previous episode is indicative of present guilt. *Cf.* C. McCormick, Law of Evidence § 43 (E. Cleary ed. 1972). However, as was recognized in *United States ex rel. Walker v. Follette,* 311 F.Supp. 490, 495 (S.D.N.Y.1970), *aff'd,* 443 F.2d 167 (2d Cir. 1971):

> While "opening the door" on direct may not amount to a blanket waiver, where as a matter of trial strategy a defendant himself decides to open up a sensitive area—whether because he hopes to draw the sting out of the prosecution's case or because he mistakenly believes he has nothing to fear—he cannot expect the same measure of protection from cross-examination as when the prosecution initiates the inquiry.[33]

The trial court apparently was of the opinion that the confinement of such inquiry to the question of credibility should be applied equally to the government and the defense; that is, just as the prosecutor may not use the fact of extrinsic wrongdoing to suggest guilt, so the defense should not be permitted unrestricted opportunity to use such evidence to suggest an absence of guilt. *See Newman v. United States,* 331 F.2d 968, 972–73 (8th Cir. 1964), *cert. denied,* 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed.2d 566 (1965). We agree. The fact and circumstances of appellant's guilty plea to an unrelated prior offense have little if any bearing on the issue of his present credibility. Trial counsel's transparent attempt to use appellant's self-serving explanation of the previous episode to buttress his account of the instant robbery was improper. *See Jenkins v. United States, supra,* 374 A.2d at 586–87 (HARRIS, J., concurring).

In his argument before us, appellant makes little effort to support defense counsel's use of the collateral offense. Rather, he suggests that the appropriate response for the trial court would have been merely to strike the offending direct testimony, and, in any event, that the latitude accorded to the government's cross-examination constitutes reversible error. The government, on the other hand, urges that as defense counsel had "opened the door" to appellant's earlier offense, the disputed cross-examination fell within the doctrine of curative admissibility. *See* 1 J. Wigmore, Evidence § 15 (3d ed. 1940). The question thus becomes whether, given the impropriety of the totality of the direct examination on this issue, the court erred in its response thereto by permitting the government to offset the defense's intended inference that had appellant been guilty in this case, he would have acknowledged his guilt.

The core principle of the doctrine of curative admissibility has been expressed as follows [C. McCormick, *supra,* § 58]:

> [O]ne who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of the opening. [Citations omitted.]

In *United States v. Winston,* 145 U.S.App. D.C. 67, 71–72, 447 F.2d 1236, 1240–41 (1971), the court explained:

> The rule operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government's being able to place them in their proper context.

Consistent with the trial court's general authority over the proper scope of witness examination, both the allowance of an opportunity to address the improper evidence or line of inquiry and the extent of such an opportunity frequently have been described as matters for the court's sound discretion.

---

**33.** In this connection we note the Supreme Court's observation in *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974): "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *See also March v. United States, supra,* 362 A.2d at 695–97; *cf. Rhodes v. United States,* D.C.App., 354 A.2d 863 (1976).

*See* C. McCormick, *supra,* § 57; 1 J. Wigmore, *supra,* § 15.

■ As the "interrelation" between the 1972 conviction and the instant offense to which appellant now objects so strenuously was the product of his own counsel's defense tactics, he cannot validly be heard to complain of the trial court's decision to allow the government an opportunity to respond. *See United States v. Cole,* 334 F.Supp. 961, 966–68 (S.D.N.Y.1971). While perhaps the better practice would have been for the court to intervene as soon as defense counsel strayed toward the forbidden area on direct [*cf. United States v. Plante,* 472 F.2d 829, 832 (1st Cir.), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1932, 36 L.Ed.2d 411 (1973)], we do not view either the fact that it did not or its conclusion that the government should be permitted some countervailing exploration of the subject to amount to an abuse of discretion. *See United States v. Boyer, supra.*[34] *See also United States v. Novick,* 124 F.2d 107, 109 (2d Cir.), *cert. denied,* 315 U.S. 813, 62 S.Ct. 795, 86 L.Ed. 1212 (1942). *Compare Clemons v. United States,* 133 U.S.App.D.C. 27, 45, 408 F.2d 1230, 1248 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). Once the collateral area had been opened up by the defense, it was within the court's authority to ensure that the trier would not be left with only appellant's untested version of the matter.[35] *See Johnson v. United States,* D.C.App., 373 A.2d 596, 598–99 (1977); *United States v. Novick, supra,* at 109; *United States v. Clark,* 294 F.Supp. 44, 52–53 (D.D.C.1968), *aff'd sub nom. Clemons v. United States, supra. Accord, Newman v. United States,*

*supra,* at 972–73; *United States v. Kim,* 193 U.S.App.D.C. 370 at 382–83, 595 F.2d 755 at 767–68 (D.C.Cir., 1979).

■ Nor do we find error in the scope of the cross-examination permitted. We are mindful that the circuit court has cautioned that the doctrine of curative admissibility is "dangerously prone to overuse" [*United States v. McClain,* 142 U.S.App.D.C. 213, 216, 440 F.2d 241, 244 (1971)], and agree with its assessment that the principle should be applied " 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.' " *United States v. Winston, supra,* 145 U.S.App.D.C., at 71, 447 F.2d at 1240, *quoting California Ins. Co. v. Allen,* 235 F.2d 178, 180 (5th Cir. 1956). *See* 1 J. Wigmore, *supra,* § 15. Nevertheless, the record reveals that the disputed cross-examination went no further than to expose the possibility that rather than emanating from a general personality trait of acceptance of responsibility for one's criminal acts, appellant's guilty plea may have been the simple product of the fact that he was caught "red-handed" immediately after the earlier robbery. We cannot say that this limited inquiry exceeded the bounds of permissible rebuttal opened to the trial court's discretionary authority as a result of defense counsel's improper tactic on direct examination. *See Curry v. United States,* D.C.App., 322 A.2d 268 (1974). *Cf. Stith v. United States,* D.C.App., 256 A.2d 403 (1969). As the declaration of a mistrial lies within the sound discretion of the trial court, and generally should be reversed for extreme situations threatening a miscarriage of justice [*see Hammond v. United*

34. While in *Boyer* the circuit court was concerned with providing the defendant with a fair opportunity to respond to the government's introduction of a collateral offense, we believe that its recognition of a "wide discretion" in the trial judge as to "where to draw the line" applies equally to the decision to allow the government some latitude to respond to the defendant's introduction of such evidence. 80 U.S.App.D.C. at 203, 150 F.2d at 596. *Cf. United States v. Crisafi,* 304 F.2d 803, 804 (2d Cir. 1962); *Brooks v. State, supra.*

35. This conclusion is consistent with the principles recognized in *Branch v. United States,* 84 U.S.App.D.C. 165, 165–66, 171 F.2d 337, 337–38 (1948):

> [I]f the accused testifies in his own behalf in a criminal case, he subjects himself to cross-examination to the same extent as any other witness. He cannot be compelled to testify as to facts not relevant to direct examination, but he can be required to supply the full details of matters within the scope of the direct examination but stated there only in part. [Footnotes omitted.]

*States,* D.C.App., 345 A.2d 140, 141 (1975); *United States v. Anderson,* 165 U.S.App. D.C. 390, 403, 509 F.2d 312, 325 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1247, 43 L.Ed.2d 672 (1975); *cf. United States v. Jorn,* 400 U.S. 470, 480–86, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)], we find no error in the denial of appellant's motion.

■■■ There remains, however, the problem of the prosecutor's phrasing of his questions on cross-examination, and the issue of whether the jury received adequate guidance on the limited use to which they might put the evidence of the prior offense. We agree that the prosecutor's gratuitous reference to the fact that appellant had struck his previous victim in the face cannot be supported by the principle of curative admissibility.[36] Moreover, in light of such an ill-advised excess, as well as in recognition of the prejudicial potential of the collateral inquiry in general, we are of the opinion that the better practice would have been for the court both to grant the defense request for reinstruction and to provide more specific guidance on the matter in its final charge to the jury. Nevertheless, we conclude that these factors do not amount to reversible error.

■■■ We are not confronted with a failure by the trial court to provide the trier of fact with any guidance on its consideration of the dispute testimony. *Cf. Dixon v. United States,* D.C.App., 287 A.2d 89, 99, *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32

L.Ed.2d 813 (1972). The court's unwillingness to reinstruct the jury during cross-examination, as well as its omission of any specific instruction on the matter in the final charge, must be viewed against the likely effect of its sua sponte cautionary instruction when defense counsel first raised the previous offense and sought to relate it to the instant charges.[37] At that point, the trial judge stated:

> I should caution at this point, although the defendant has just admitted that he had a record of a previous criminal conviction, that evidence is admitted by the Court for the purpose of permitting you to use it in your evaluation of the credibility and believability to be accorded to the defendant's testimony in this matter. It's not admitted for the purpose of proving in and of itself that he committed the matter to these charges in this case, and you should not use it for that purpose, but use it only for the purpose of evaluating the credibility to be accorded to the defendant's testimony in this case. I am sure you understand that.

*Compare United States v. Lee,* 166 U.S.App. D.C. 67, 74 & n.17, 509 F.2d 400, 407 & n.17 (1974), *cert. denied,* 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 763 (1975) (upholding a robbery conviction in a converse situation; that is, proper instructions on the impeachment by prior offense were given in the final charge, but not immediately during the cross-examination), *with Curry v. Unit-*

---

**36.** We are not persuaded by the government's suggestion that appellant's testimony on direct that he "snatched a lady's pocketbook" provided a sufficient "opening" for the prosecutor to reveal that in the process he had "struck a 58 year old woman in the face." *Cf. United States v. Winston, supra,* 145 U.S.App.D.C., at 71, 447 F.2d at 1240. Such an inflammatory declaration was both irrelevant to the question of credibility (the sole permissible objective of such a collateral inquiry), and, even within the doctrine of curative admissibility, was unnecessary to rebut defense counsel's improper correlation between the previous guilty plea and instant charges.

**37.** Appellant's reliance on *United States v. Carter, supra,* is misplaced. While in that case the circuit court reversed a robbery conviction despite the giving by the trial court of both imme-

diate and final instructions on the proper use of the disputed impeachment, there the defense had not initiated the inquiry into the collateral matter. In the case before us, appellant's trial counsel not only "opened the door" to the line of inquiry, but was guilty of the very abuse (*i. e.,* attempting to apply the extrinsic transaction to the issue of present guilt) of which the *Carter* court was so critical. *Id.,* 157 U.S.App. D.C., at 152, 482 F.2d at 741. *See United States v. Henry, supra,* 174 U.S.App.D.C., at 94, 528 F.2d at 667. *United States v. McClain, supra,* also relied upon by appellant, should be read in light of the circuit court's subsequent decision in *United States v. Bobbitt,* 146 U.S. App.D.C. 224, 450 F.2d 685 (1971). *See Rink v. United States,* D.C.App., 388 A.2d 52, 57 n.7 (1978).

ed States and Dixon v. United States, supra (upholding convictions where there were final instructions but no immediate guidance on the impeachment evidence). Apart from our previously expressed reservations concerning the wisdom of allowing the defense to embark upon the collateral line of inquiry, the court's remarks constituted an accurate statement of the law and we are satisfied that they provided the jury with an adequate understanding of the applicable evidentiary principles. See Dixon v. United States, supra. Cf. Spencer v. Texas, 385 U.S. 554, 560–61, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

 Defense counsel made a request for immediate reinstruction during cross-examination.[38] However, trial counsel thereafter made no further reference to the matter.[39] No request was made for the inclusion of any specific instruction when the court queried counsel as to its final charge [cf. United States v. Henson, 159 U.S.App.D.C. 32, 39 n.6, 486 F.2d 1292, 1299 n.6 (1973)], and no obligation was made to its subsequent determination not to include explicit instructions on the disputed testimony.[40] See Watts v. United States, D.C.App., 362 A.2d 706 (1976) (en banc); Cobb v. United States, D.C.App., 252 A.2d 516 (1969); Super.Ct.

Cr.R. 30 and 52(b). Finally, our review of the record reveals no indication that the deliberations of the jury may have been infected with confusion or prejudice as a result of either the prosecutor's questions or the alleged inadequacy of the court's instructions.[41] The government presented a strong case against appellant, and we are confident that the outcome was unaffected by the matter. See Gaither v. United States, 134 U.S.App.D.C. 154, 172–73, 413 F.2d 1061, 1079–80 (1969). The error, if any, was harmless. See Dixon v. United States, supra, at 99–100; compare United States v. Henry, supra, 174 U.S.App.D.C., at 95, 528 F.2d at 668. Cf. United States v. Park, 421 U.S. 658, 673–77, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

## IV

Appellant's third contention is that the trial court erred in excluding the testimony of an expert in the dental sciences, which, it was proffered, would have established that the type of gap or space between appellant's front teeth (to which several of the eyewitnesses had referred) is an orthodontic configuration occurring in up to 20 percent.

**38.** In response to counsel's request for reinstruction, the court explained:

I told them that before, and I think it's sufficient for the purpose of this case. Any improper use to which this jury may put this evidence has been created as a result of what you did in the first instance. . . . I feel it has been cured by my instructions to them already. . . . I don't believe [that to reinstruct the jury] would serve any purpose at this time. You opened up the facts with respect to that other case, and the motivations of the defendant in pleading guilty in that case as opposed to not pleading guilty in this case, you shouldn't have done that.

**39.** We note that in her general protest to the cross-examination, defense counsel failed to specify whether her objection was to the direction of the government's question or to its inflammatory phrasing. The distinction is not frivolous, for only upon the latter ground would the court's response be subject to question. Moreover, had counsel made clear that, in addition to her challenge to the general admissibility of such cross-examination, she questioned the graphic manner in which the prosecutor recited the details of the prior offense, the

court might then have taken some remedial action despite its decision to allow the cross-examination to proceed.

**40.** Where, as here, the defense neither requests special instructions in the final charge concerning the proper limits on impeachment evidence of extrinsic wrongdoing, nor objects to the omission thereof, appellate courts "should be extremely chary of resorting to 'plain error' " in their review of the matter. See Simmons v. United States, D.C.App., 364 A.2d 813, 817 (1976); cf. Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

**41.** The court's final charge did contain both a thorough explanation of the fact that the jurors were the "sole and only judges of the credibility or believability of [all of the] witnesses," and a proper caution that "statements and argument to be made by counsel during the course of the trial . . . are not evidence in the case." The court also provided the jury with the standard instructions governing their consideration of the defendant's testimony.

of all black males.[42] The trial court barred the expert's testimony on the grounds (1) that it would be irrelevant to the issue of identification, (2) that it would be unnecessarily time-consuming, and (3) that the jury readily could resolve such matters as the reliability and credibility of the eyewitness testimony, as well as the ultimate issue of identification, without such assistance. Appellant contends that the proffered evidence would have provided significant assistance to the jury in its weighing of the identification testimony, and for that reason its exclusion was error. We conclude, however, that the disputed ruling is supported by the record and wholly consistent with the applicable law.

■ While it is true, as appellant argues, that the trial court must consider the likelihood that the testimony of the proffered expert will "aid the court or the jury in determining the questions in issue" [*Casbarian v. District of Columbia*, D.C.Mun. App., 134 A.2d 488, 491 (1957); *see United States v. Jackson*, 138 U.S.App.D.C. 143, 145, 425 F.2d 574, 576 (1970)], such an inquiry is only one of several factors which govern the admissibility of expert testimony. The applicable test was set forth in

*Waggaman v. Forstmann,* D.C.App., 217 A.2d 310, 311 (1966):

It is well settled in this jurisdiction that to warrant the use of expert testimony the subject dealt with must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman and the witness must have such skill, knowledge or experience in that field or calling that his opinion will probably aid the trier in his search for the truth.[43] [Citing *Jenkins v. United States,* 113 U.S.App.D.C. 300, 306, 307 F.2d 637, 643 (1962). *See Douglas v. United States,* D.C.App., 386 A.2d 289, 295 (1978). *Cf.* Fed.R.Evid. 702 (1975).]

■ The trial court concluded that the frequency of gapped or chipped teeth (with its attendant implications concerning the reliability of the eyewitness testimony) was not beyond the ken of the lay trier. The court analogized the matter to that of the frequency of blue eyes and other familiar distinguishing characteristics, which manifestly lie within the realm of common understanding and experience, and concluded that expert testimony was unwarranted.[44] We agree. *See Dyas v. United States,* D.C.App., 376 A.2d 827, 832 (1977).

**42.** Three government witnesses referred to appellant's teeth during their identification testimony. Patricia Bennet described the distinguishing characteristic as a "space" between the front teeth, but on another occasion she said that it might have been either a "gap" or a chipped tooth. The other two witnesses, Burton Powell and Joan Martin, both described the condition as a "chipped tooth."

**43.** The precursor to the *Waggaman* formulation had been that of *King v. Davis,* 54 App.D.C. 239, 242, 296 F. 986, 989 (1924): "We recognize the rule that expert testimony is permissible only where the thing to which it relates is so far removed from ordinary human experience that a jury will presumably not possess the skill or knowledge requisite to draw a proper inference from the facts, even if such facts could be ascertained."

This cautious approach with respect to expert testimony has been approved by the Supreme Court. In *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962), the Court observed:

[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge "if all the pri-

mary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation . . . ." [Quoting *United States Smelting Co. v. Parry,* 166 F. 407, 415 (8th Cir. 1909).]

**44.** The prerequisite that the proffered expert testimony be of assistance to the trier is not satisfied by the mere fact that the witness is capable of giving competent and relevant testimony on the matters at issue, for where the trier is just "as competent as an expert to consider and weigh the evidence and to draw conclusions therefrom, it is improper to use expert testimony." *Waggaman v. Forstmann, supra,* at 311 (citations omitted). *Accord, Gerber v. Columbia Palace Corp.,* D.C.Mun.App., 183 A.2d 398, 399–400 (1962); *Henkel v. Varner,* 78 U.S.App.D.C. 197, 198, 138 F.2d 934, 935 (1943).

Moreover, in addition to these considerations, as with any type of evidence, the admission of expert testimony remains a function of the trial court's sound discretion [*see Smith v. United States,* D.C.App., 389 A.2d 1356, 1358 (1978); *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 119, 8 L.Ed.2d 313 (1962); *see also Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Baker v. United States,* 131 U.S.App.D.C. 7, 36, 401 F.2d 958, 987 (1968)], exercised in accordance with the general principle that the probative value of the proffered evidence must outweigh its potential for prejudice. *See Douglas v. United States, supra,* 386 A.2d at 295; *United States v. Brown, supra,* 501 F.2d at 150; *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973). Here the trial court concluded that the abstract statistical frequency of the type of orthodontic configuration possessed by appellant would be of little probative value to the issues before the jury, and that the exploration of such collateral matters would prejudice the orderly progression of the trial.[45] Despite the exclusion of the expert witness, however, appellant did have ample opportunity to cross-examine the eyewitnesses and thus employ the conventional means by which the reliability of such evidence is to be tested. *See Smith v. United States, supra,* at 1359; *United States v. Amaral, supra,* at 1153. Even were we able to attach to the proffered testimony the probative value or significance asserted by appellant, we find nothing in the record to suggest that the disputed ruling amounted to an abuse of discretion. *See Smith v. United States, supra,* at 1359–60; *Punch v. United States,* D.C.App., 377 A.2d 1353, 1358 (1977); *United States v. Amaral, supra,* at 1152. We conclude, therefore, that the trial court did not err in excluding the testimony of the dental expert.

## V

■ Appellant's final argument is that the trial court erred in admitting the in-court identification testimony of Officer Wilson. Despite the officer's close exposure to appellant during the incident at the bus stop, he apparently failed to select photographs or slides of appellant from various arrays, and did not recognize him until the lunch recess during the first day of trial. At that time the sole other occupants of the courtroom were appellant and counsel for both the government and the defense. Following a hearing out of the presence of the jury, the trial court concluded that the circumstances presented "no constitutional impermissiveness," and ruled that Officer Wilson would be permitted to make an in-court identification. Appellant argues that the in-trial confrontation contravened the due process principles recognized in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and its progeny, and therefore that the disputed testimony should have been excluded. We disagree.

■ Underlying the case law relied upon by appellant is the concern that the fair trial guaranteed by the due process clause may be rendered unobtainable where improper identification procedures fatally infect the witness' ability to connect the accused with the charged offense. The critical inquiry is whether the challenged procedures are so unnecessarily suggestive that there exists a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See Stovall v. Denno, supra,* 388 U.S., at 301–02, 87 S.Ct. 1967. Such an inquiry involves an examination of both the likely effect of the intervening exposure of the witness to the defendant and the ability of the latter to combat the possibility of misidentification. *See Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). On the facts before us, we have no difficulty in sustaining the trial court's conclusion that there was no constitutional bar to Officer Wilson's in-court identification of appellant.

---

**45.** *Cf. Salem v. United States Lines Co., supra,* 370 U.S., at 37 n. 6, 82 S.Ct. 119. A further source of potential prejudice is the possible dominance of the jury by the expert witnesses.

*See Bethea v. United States, supra,* 365 A.2d at 81–82; *Smith v. United States, supra,* 389 A.2d at 1359.

The nature of the challenged confrontation is of critical importance. While the Supreme Court thus far has confined its attention in this area to situations involving the pretrial exposure of the accused to potential witnesses, here we deal with a confrontation which occurred during the course of the trial. Appellant correctly observes that by its very nature the trial process is extremely suggestive, and we do not quarrel with his general thesis that the constitutional interest in safeguarding the witness' ability to give untainted testimony does not cease at the commencement of the adjudicatory proceedings. However, we believe that, consistent with the pronouncements of the Supreme Court, proper regard may be given to the fact that unlike the situation in an avoidable one-on-one confrontation at the police station house [see, e. g., Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)], the suggestivity inherent in the trial process is both inescapable and, being subject to the ameliorative scrutiny of court and counsel, less threatening of the due process guarantee. In an analogous context, the Ninth Circuit observed:

Undoubtedly any in-court identification confrontation, whether at a preliminary hearing or at trial, whether the defendant is tried alone or with others, carries with it the stigma of the inevitable suggestion that the state thinks the defendant has committed the crime. . . . But more than suggestion is required for a due process violation—the procedure must create "unnecessary" or "impermissible" suggestion. As in *Stovall,* the necessity and constitutional propriety of a suggestive confrontation must be judged in light of the state's interest in the procedure as well as by the danger it poses to a defendant. . . . The risk of a mistaken identification becoming irreparably "fixed" and not later to be shaken by cross-examination, which condemns suggestive confrontations in the police station, is far less present in the court proceeding because, as here, the identification can be immediately challenged by cross-examination. [*Baker v. Hocker,* 496 F.2d 615, 617 (9th Cir. 1974) (holding in-court identification testimony admissible despite the suggestive exposure of the defendant to a witness during a preliminary hearing).]

On two previous occasions we have rejected challenges to in-court identification testimony where, as here, the claim that such testimony had been influenced improperly rested upon no more than the fact that the witness had an opportunity to view the accused in the focus provided by the trial process. *Brown v. United States,* D.C.App., 327 A.2d 539 (1974) (the witness saw the defendant in the courtroom during a bench conference immediately before trial); *In re W. K.,* D.C.App., 323 A.2d 442 (1974) (rejecting the argument that in-court identification testimony of a witness who had made no previous identification would be impermissibly tainted by the suggestivity of seeing the accused seated with defense counsel). We reiterate the principle that, without more, the mere exposure of the accused to a witness in the suggestive setting of a criminal trial does not amount to the sort of impermissible confrontation with which the due process clause is concerned.[46] *See United States v. Gentile,* 530

---

**46.** Contrary to appellant's assertion, the requirement that the government demonstrate the reliability of the disputed identification testimony [*i. e.,* the existence of an "independent source" therefor, *see, e. g., United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)], as a prerequisite to its admissibility, does not arise merely because there has occurred a suggestive confrontation between the witness and the accused. To put the government to such proof, the putative unreliability must be the product of an impermissible identification procedure. *See, e. g., Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (en banc), *cert. denied,* 394 U.S.

964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); *cf. United States v. Dailey,* 524 F.2d 911 (8th Cir. 1975). As the circuit court explained in *Russell v. United States,* 133 U.S.App.D.C. 77, 82 & n. 25, 408 F.2d 1280, 1285 & n. 25, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969):

Stovall v. Denno did not erect a due process barrier against all unreliable identifications; it requires exclusion only of evidence which could and should have been obtained by procedures less conducive to unreliability.

\* \* \* \* \* \*

F.2d 461, 467–69 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *United States v. Davis,* 487 F.2d 112, 122 (5th Cir. 1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974); *United States v. Hamilton,* 469 F.2d 880, 883 (9th Cir. 1972).[47]

Appellant places great emphasis on the fact that on previous occasions Officer Wilson had been unable to select his picture from photographic arrays. We have held both that the absence of pretrial identification of the accused by a witness does not preclude that individual from giving in-court identification testimony. *In re W. K., supra,* and that an in-court identification may be permissible where the witness has failed to make a pretrial photographic identification.[48] *Reavis v. United States,* D.C. App., 395 A.2d 75 (1978); *see United States v. Dobson,* 512 F.2d 615 (6th Cir. 1975). We do not doubt that Officer Wilson's recollection was in fact refreshed by his in-court

exposure to the accused, but, as with any witness, such a circumstance would have occurred in any event when the officer was called to the stand.[49] *Cf. United States v. York,* 138 U.S.App.D.C. 197, 201, 426 F.2d 1191, 1195 (ROBB, J., dissenting).

▇▇▇ As indicated above, absent a constitutionally cognizable impropriety in the procedure by which the accused is exposed to the witness, the fact that such a confrontation was suggestively focused does not by itself raise a bar to that witness' identification testimony. *Reavis v. United States, supra; cf. United States v. Gambrill,* 146 U.S.App.D.C. 72, 77, 449 F.2d 1148, 1153 (1971). The preconfrontation weakness of the officer's recollection adds nothing to appellant's constitutional argument for the failure to make an earlier identification goes to the weight to be accorded to the witness' in-court testimony, and not to its admissibility. *See In re W. K., supra,* at

---

[C]onsiderations bearing on the actual reliability of an *identification are relevant only to* a determination of whether there was an "independent source" for an identification made at or after an unnecessarily suggestive confrontation. [*See Clemons v. United States, supra,* 133 U.S.App.D.C. at 45–47, 408 F.2d at 1248–50.]

Moreover, it should be noted that even unnecessarily suggestive identification procedures will not raise an automatic bar to in-court testimony. In *Neil v. Biggers, supra,* 409 U.S., at 199, 93 S.Ct. at 382, the Supreme Court emphasized that such testimony is not to be suppressed if the trial court finds that "under the 'totality of the circumstances' the identification was reliable even though the confrontation was suggestive." *See Manson v. Brathwaite,* 432 U.S. 98, 109–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Gregory v. United States,* 133 U.S.App. D.C. 317, 323–25, 410 F.2d 1016, 1022–24, *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969); *Clemons v. United States, supra,* 133 U.S.App.D.C. at 34, 408 F.2d at 1237.

**47.** In *United States v. Hamilton* the court found no error in a refusal to strike in-court identification *testimony which had been preceded by* the inadvertent confrontation between a witness and the defendant in the courthouse corridor immediately before trial. The *Ninth Circuit* observed:

It might well be argued that the deeply-rooted practice of allowing witnesses to identify the defendant in open court is no less a suggestive show-up than those condemned by *Stovall* and *Foster.* But we decline to

take the giant step of holding in-court identifications inadmissible. It is sufficient safeguard that the accused be allowed to question the weight to be given the "in-court" identification considering the length of time the witness saw the perpetrator of the crime, the elapsed time between the act and the trial, and the fact that the witness had made no other identification of the defendant. [469 F.2d at 883; footnote omitted.]

**48.** Appellant does not challenge the propriety of the earlier unsuccessful procedures, or suggest that they may have influenced in any way Officer Wilson's ability to make an in-court identification. *Cf. Marshall v. United States,* D.C.App., 340 A.2d 805, 807–08 (1975).

**49.** We view as insignificant the fact that the confrontation which Officer Wilson indicated had revived his recollection of the incident in question occurred while the trial was in recess and the courtroom empty save for appellant and counsel. As the fact of the trial itself already had subjected appellant to a one-on-one focus and the witness wo⸗'d have ample opportunity for such individualized scrutiny once he took the stand, we fail to see how this circumstance adds to appellant's claim of impermissible suggestivity. *See United States v. Clark,* 506 F.2d 416, 418 (5th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1957, 44 L.Ed.2d 454 (1975) (witness' identification testimony not impermissibly tainted by the fact that during a recess he had seen the defendant in handcuffs).

444; *United States v. Black,* 412 F.2d 687, 689 (6th Cir. 1969), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970). *See also Brown v. United States,* D.C.App., 349 A.2d 467 (1975) (error to suppress identification testimony on the ground that it was too weak); *United States v. Jackson,* 166 U.S.App.D.C. 166, 173–74, 509 F.2d 499, 506–07 (1974); *cf. Clemons v. United States, supra,* 133 U.S.App.D.C. at 34, 408 F.2d at 1237. There was no due process obstacle to the in-court identification testimony by Officer Wilson.

While we thus are of the opinion that the absence of any unconstitutional suggestivity in the in-court confrontation between appellant and Officer Wilson fully disposes of appellant's claim, it should be noted that under the instant circumstances there was little chance that the challenged exposure resulted in an "irreparable misidentification." In the first place, this was not a single witness case [*cf. Smith v. United States,* D.C.App., 343 A.2d 40 (1975)], for the disputed identification was merely cumulative of the testimony of the government's other witnesses who placed appellant both at the scene of the robbery and at the bus stop thereafter. *Cf. Brown v. United States,* D.C.App., 349 A.2d 467 (1975). More importantly, appellant was fully able to test the officer's in-court identification testimony and the possible impact of the disputed confrontation. Appellant's exposure to the witness occurred in the presence of his counsel.[50] Defense counsel was made aware of the previous failures of Officer Wilson to identify the accused, and the matter was thoroughly explored on cross-examination.[51] The in-court identification testimony was properly admitted. *See Reavis v. United States, supra; In re W. K., supra; Baker v. Hocker, supra; United States v. Davis, supra,* at 122; *United States v. Hamilton, supra. See also United States v. Gentile, supra,* at 467–69.

*Affirmed.*

**50.** Appellant's reliance on *United States v. Greene,* 139 U.S.App.D.C. 9, 429 F.2d 193 (1970), *United States v. York,* 138 U.S.App.D.C. 197, 426 F.2d 1191 (1969), and *Mason v. United States,* 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), is misplaced. Each of those cases involved a pretrial confrontation which had been arranged by the prosecutor, who remained with the witness during his exposure to the accused. *Cf. Swann v. United States,* D.C.App., 326 A.2d 813, 814–15 (1974); *United States v. Gentile, supra,* at 468. We specifically rejected the relevance of these decisions in *Brown v. United States, supra:*

> Whatever weight might be given these holdings under circumstances revealing intentional suggestive efforts by the prosecution to obtain an initial identification, we are not inclined to view them as supporting the notion that calling a case to trial before the witnesses have been sent out of the courtroom will raise the spectre of inadmissibility of trial identification testimony. Courtroom identifications thereafter, even if unaided by official pre-trial identifications, are open to attack on their worth but not on their admissibility. [327 A.2d at 541; citation omitted.]

In addition to the absence of any improper pretrial activity by the prosecutor, the instant case is further distinguished by the fact that, while *Greene, York,* and *Mason* involved an absence of counsel (in *York* the point was uncertain, *see id.,* 138 U.S.App.D.C., at 198 n. 7, 426 F.2d at 1192 n. 7), here the challenged confrontation occurred in the presence of defense counsel. (As both the prosecutor and the witness fully and candidly recounted the details of the in-court viewing and the officer's previous inability to make an identification to the court and appellant's trial counsel, appellant's argument concerning his counsel's apparent lack of awareness at the time of exposure is not substantial.) The absence of a Sixth Amendment defect in the confrontation procedure is significant. It has been held that following *Neil v. Biggers, supra,* a due process challenge to identification testimony must be supported by a demonstration that not only was the confrontation procedure unnecessarily suggestive, but also that the subsequent testimonial evidence was, as a result thereof, unreliable. *See Manson v. Brathwaite, supra; Cureton v. United States,* D.C.App., 386 A.2d 278, 284–85 (1978).

**51.** There is nothing in the record to suggest that the jury accorded the disputed identification testimony more than the limited weight to which it was entitled. *Compare United States v. York, supra,* 138 U.S.App.D.C. at 199 n. 17, 426 F.2d at 1193 n. 17.