**David M. McCALL, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 89–1298.

District of Columbia Court of Appeals.

Argued April 23, 1991.
Decided Aug. 30, 1991.

Barbara R. Miller, Washington, D.C., appointed by this court, for appellant.

Carolyn K. Kolben, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, and Daniel Friedman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

This is an appeal from a judgment of conviction for assault entered after a jury trial. It presents for our determination whether the trial court, under the particular circumstances, committed reversible error by permitting an eyewitness to the crime, who was never shown prior to trial a photo array or line-up of suspects, to identify appellant in court as one of the several assailants of the victim.[1] We affirm.

The victim testified at trial that he was walking in Georgetown shortly after midnight on his way to his parents' home in September 1988, when persons in an automobile hailed him. After some conversation, one of the passengers grabbed a jacket he was carrying. When the victim sought to retain it, he was pulled into the car which drove away. Ultimately, he ex-

---

1. We note that appellant does not deny his presence at the scene of the attack, but argues only that he was not one of those who in fact assaulted the victim. Thus, in assessing prejudice, it is relevant that the issue was not identifying appellant from all the world, as with a conventional alibi, but rather from the three defendants, who constituted the group of males admittedly at the scene.

tricated himself (but not his jacket) from the car and fled. Some of the persons in the car, which had again stopped, pursued him on foot. They caught up with the victim and kicked and beat him and stole his boots. He identified appellant as one of those who had attacked him.

The eyewitness testified at trial that he had just parked his car when the victim came running up to him and pleaded for help. The witness observed appellant and others come around the corner and commence to push and then kick the victim when he fell to the sidewalk. The witness left the scene and called the police emergency number.

In addition, the witness testified, under questioning by the prosecutor, that he was not contacted by the police or the prosecutor about being a witness until late May or early June, 1989. At this point in the trial, the prosecutor requested a bench conference. There, he advised the trial court of "[t]he question I contemplate asking him ... do you think you would recognize any of the people if you saw them again. And I expect his answer will be, no, I don't. I can't guarantee that's his answer because I never had him looking at them."

The defense attorney protested to the court, "I was informed before the trial that [the prosecutor] was not going to ask him to make any in-court identifications."

Agreeing with defense counsel that he had said the witness would not be asked to give an in-court identification, the prosecutor replied, "I'm not asking him in order to get an in-court identification. I'm asking him because ... I want the jury to understand that the reason he's not being asked is too much time's passed."

Defense counsel responded that "there was opportunity to show him the line-up video tape ... the line-up photograph ... the photo array and it wasn't done."

The trial court interposed, "How is your client [appellant] prejudiced? ... Defense counsel replied, "Because he'll pick him [appellant] out in the courtroom. It's an unfair line-up." However, defense counsel was unable to provide legal authority to the trial court to support the proposition he was advancing: that the prosecution was obliged "to show a photo array or has to have a line-up before they can elicit an in-court identification...." [2]

Ultimately, the trial court overruled the defense objection and the prosecutor asked his question of the witness: "[D]o you think that at this time you would recognize any of the people that you saw that night if you saw them again?"

The witness replied, "With less than a hundred percent vivid recollection I would.... The young blond man there certainly fits my recollection.... His face does fit my recollection."

The witness then indicated appellant in the courtroom and explained that he had "recollected" him as "the first person chasing [the victim] around the corner." The witness went on in his testimony to state with respect to appellant, "The gentleman is about four inches taller than I recalled. That is, *as I have seen him standing up*, I have said to myself this person is taller than I recalled." (Emphasis added.)

Then, the following colloquy took place between the prosecutor and the witness:

Q. As you've seen who standing up?
A. The gentleman there.
Q. Where did you see him standing up?
A. I have seen him by the entrances and exits over at least the last two days.

Defense counsel cross-examined the witness and elicited from him that between the event and the trial no one ever showed him an array of photos, or a photo or videotape of a line-up. Appellant's counsel then asked the witness to "pick out the three people who are on trial here in the

---

**2.** On appeal, appellant makes clear in his brief that he is not now objecting on the ground that the in-court identification was impermissibly suggestive. He concedes "there is nothing inherently improper about an in-court identification," and he acknowledges that "even a witness who has failed to make an out-of-court identification may be brought into court and permitted to identify the defendant from the stand." *See Middleton v. United States*, 401 A.2d 109, 132–33 (D.C.1979); *Brown v. United States*, 327 A.2d 539, 541 (D.C.1974).

courtroom," and the witness guessed that they were "[t]he three young men sitting behind the three defense attorneys."

On redirect-examination by the prosecutor, the witness stated that "it is not solely because he [appellant] is sitting where he is sitting that I associate him as being a defendant in this case." The witness went on to explain, *"I have seen him outside of this courtroom and I have seen him by the main entrance of the ground level entrance to this building....* The first time I saw him standing nearby this courtroom ... [h]e looked quite close enough to my recollection that I said to myself this is the main defendant ... the person who came around [the corner] first, the person who was most aggressive, and the only person with whom I had eye contact." (Emphasis added.) [3]

▇ Appellant contends that the witness's "in-court identification of appellant should have been excluded, *not* because the surrounding circumstances were impermissibly suggestive, but because the prosecutor had assured appellant's counsel before trial that no such identification would be elicited." (Emphasis added.) Appellant relies on *Rosser v. United States*, 381 A.2d 598 (D.C.1977), and *Smith v. United States*, 491 A.2d 1144 (D.C.1985), in support of his argument that the prosecutor's conduct here was as opprobrious as that in *Rosser* and hence constitutes cause for reversal.

Although we agree that a prosecutor should not make certain representations to counsel without being held accountable, we conclude that the circumstances of this case do not warrant reversal. Both *Rosser* and *Smith* are distinguishable from this case. In those cases, the prosecutor knew prior to trial the substance of the witness's statement and intentionally misled defense counsel. *Smith, supra*, 491 A.2d at 1147–

48; *Rosser, supra*, 381 A.2d at 609. Here, so far as the record shows, the prosecutor was not aware that the witness had seen appellant after the crime but before he took the stand and had from such sightings refreshed his recollection of appellant's participation in the crime that took place in his presence. Thus, the substance of the witness's testimony was as much of a surprise to the prosecutor as it was to defense counsel. Furthermore, had the trial judge held a hearing without the jury, the witness's testimony would still have been admissible since appellant does not assert that the chance encounters were in any way planned by the prosecution or otherwise impermissibly suggestive.

In our view, the record reflects not duplicitous but rather careless conduct by the prosecutor.[4] However, there is nothing in the record to show that the prosecutor *knew* when he asked his question, "Do you think at this time you would recognize any of the people that you saw that night if you saw them again," that the witness would answer, "With less than a hundred percent vivid recollection I would.... The young blond man there certainly fits my recollection." Rather, the record reflects that the prosecutor had anticipated an answer in the negative from the witness. Thus, we reject appellant's argument that the "prosecutor chose to ambush appellant by eliciting in-court identification after [the witness] was already on the witness stand, at which time it was too late to arrange a fair confrontation."[5]

Appellant also contends that the prosecutor "[b]y failing to timely disclose his intention to elicit an in-court identification from [the witness] ... prevented appellant's counsel from filing a pretrial motion to suppress the testimony." *See In re F.G.*, 576 A.2d 724 (D.C.1990) (en banc) (holding that defendant is entitled to a pretrial hear-

---

3. We note that appellant was at liberty upon his personal recognizance pending trial.

4. Indeed, according to the record, the witness was not even contacted by police or prosecutor from the time of the crime—September 1988— until May or June, 1989.

5. As we have noted, appellant does not now assert that the surrounding circumstances of the in-court identification were impermissibly suggestive. Nor does appellant assert that the chance sightings of appellant by the witness were under impermissibly suggestive circumstances.

ing on a motion to suppress show-up identification evidence unless sought in bad faith). First, the record does not support appellant's assertion that the prosecutor intended by his question of the witness to elicit any in-court identification testimony. Rather, the prosecutor had explained that he intended by his question to take the "sting" out of what he anticipated would be the inability of the witness to make an identification.

Second, a pretrial suppression hearing would not have brought the desired result. Defense counsel maintains that he would have kept appellant out of the witness's sight during a pretrial hearing on identification testimony. Because the witness's memory was restored by his encounters with appellant, a pretrial hearing would have elicited no useful identification information.[6]

It may be urged that appellant suffered prejudice as well from defense counsel's inability to obtain a pretrial identification from a photo array of videotaped line-up. See Berryman v. United States, 378 A.2d 1317, 1319–20 (D.C.1977). Clearly, the witness's failure to identify appellant in a pretrial identification could be used to impeach his incourt identification. However, as the court suggested to defense counsel, the witness could also be impeached by the fact that he could only identify appellant in-court, an inherently suggestive type of identification. However, because of the chance sightings which lent credibility to the witness's testimony, such impeachment was not successful.

In any event, once the witness did identify appellant at trial as the "most aggressive" of the victim's attackers, the defense then had an opportunity to move for a mistrial on the ground that such identification had been impermissibly suggestive.[7] Appellant did not do so. Rather, the record reflects that appellant on the second day of the trial following the witness's in-court identification of appellant filed a motion for a mistrial on the sole ground that the chance sightings of appellant by the witness were improper because they took place without defense counsel being present. Thus, the defense had an opportunity to show prejudice but chose not to challenge the witness's identification of appellant under impermissible circumstances.

▮ In sum, we reject appellant's argument that under the circumstances, the prosecutor engaged in misconduct so as to require reversal. Neither are we persuaded upon the record here by appellant's assertion that he was "deprived ... of the opportunity to persuade the trial court that any in-court identification by [the witness] would be so hopelessly unreliable that it should be excluded on either constitutional or evidentiary grounds."[8] Specifically, ap-

6. Appellant also asserts that had he known that the witness would make an identification by reason of his unplanned sightings, he would have taken steps to avoid such chance encounters with the witness. Although the record does reflect that the prosecutor had admonished the witness to avoid contact with appellant, it seems unlikely that the defense could have physically disguised appellant each day he came to court or spirited him in and out of the courtroom each day of this lengthy proceeding so as to eliminate the possibility of the chance sightings that in fact occurred. As we have noted, appellant was not in custody prior to and during the trial.

7. It may be argued that the failure of defense counsel to articulate sufficient arguments at trial to convince the trial court to suppress the testimony was because "it would be unreasonable to fault counsel or penalize his client because the attorney failed to assemble and enumerate all of the effective arguments available to him in a short sidebar conference with the judge."

We do not express an opinion on the validity of this argument because defense counsel had ample opportunity, from the time that the witness testified until he made his second motion for a mistrial two days later, to marshall his effective arguments but he failed to do so.

8. Appellant argues, for the first time in this court, that the trial court erred by failing to consider certain factors when weighing the probative value against the reliability of the testimony. In Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court stated that such factors as the witness's opportunity to view appellant at the time of the crime, his degree of attention, the accuracy of his description, the level of certainty demonstrated at the confrontation and the time elapsed between the crime and the confrontation may be considered. Id. at 114, 97 S.Ct. at 2253. See also Beatty v. United States,

pellant never contended that the accidental sightings by the witness of appellant were under impermissibly suggestive circumstances, and he has conceded that the in-court identification was not unreliable.[9] Appellant was afforded an opportunity by the trial court to move to suppress the in-court identification on the ground of undue suggestivity, but instead, chose to move for a mistrial on an entirely different ground. Thus, under the particular circumstances, we are obliged to affirm the judgment of conviction.

*So ordered.*

SCHWELB, Associate Judge, dissenting:

In my opinion, McCall was substantially prejudiced when the prosecution effectively broke a promise to him. Accordingly, I respectfully dissent.

I

This case arises out of a rather bizarre encounter in Georgetown in the early morning hours of September 14, 1988. The complaining witness, Dr. Michael Daly, is a young British doctor who had arrived in the United States only four days earlier to work at the National Cancer Institute. On the evening in question, Daly had visited a "pub" and socialized. Shortly after midnight, he was walking up Wisconsin Avenue towards his parents' home.

It was apparently Daly's appearance that led to his unwelcome confrontation with young men bent on doing him harm. Daly's hair had been cut short, he was carrying a green "bomber" jacket over his arm, and he was wearing jeans and a pair of "Dr. Martin" boots. The cumulative effect of these features of his appearance was evidently to make him look rather like a "skinhead." A car occupied by six young people who were apparently affecting or "into" the "skinhead" lifestyle pulled up next to Daly. The driver of the vehicle was one Arnold Robles, with two young women, Deirdre Ford and Mary Cabrera, riding in the front seat. David McCall was in the rear of the car, flanked by his eventual codefendants, Richard Craig Grimes and Mark Hyder.

Apparently egged on by Grimes, one of the young women asked Daly if he was a skinhead and a "white power." There is some dispute about exactly what response Daly provided to this rather provocative inquiry,[1] but it appears that the conversation which ensued was interrupted when Grimes suddenly grabbed Daly's coat.

544 A.2d 699, 701 (D.C.1988); *Sheffield v. United States,* 397 A.2d 963, 966–67 (D.C.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979).

Arguments raised for the first time on appeal will be reviewed only for plain error and we find no error here. *Allen v. United States,* 495 A.2d 1145, 1150–54 (D.C.1985).

Moreover, defense counsel attempted to cast doubt on the witness's credibility during his cross-examination of the witness, however, the witness was able to effectively counter any suggestions of unreliability. We are presented in this case with an extremely articulate and convincing witness who, unexpectedly, through a quirk of fate was able to remember appellant and the events of the night of the crime in great detail.

9. This court has upheld an in-court identification resulting from a chance encounter with a defendant if five factors are satisfied. *See Harvey v. United States,* 395 A.2d 92 (D.C.1978), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979). The five factors are: (1) the confrontation is inadvertent, accidental, or unplanned, (2) the identification is spontaneous and positive, (3) the police and prosecution did not intend that an indentification be attempted, (4) no one pointed out the accused to the witness, and (5) the witness is cross-examined fully at trial concerning the basis of the identification. *Id.* at 95. On the evidence of this record, we are satisfied that all five factors were complied with in this case.

1. According to all of the witnesses who commented on the point except Grimes, Daly denied that he was "white power" but intimated that he was a skinhead part of the time, or words to that effect. In a subsequent confession in which he admitted assaulting and robbing Daly (to whom he referred as the "gentleman") and also identified McCall and Hyder, Grimes contended that the "gentleman" had said he was "white power" and had demanded to know, in effect, what was wrong with that. Grimes indicated that he told the man that he was an "ass hole" and that he (Grimes) had close black friends. Grimes explained that he directed the "gentleman" to take his boots off because the "gentleman" was a "white power," thus apparently claiming to have committed the robbery in order to strike a blow for racial tolerance.

Daly dived head first into the car, apparently to fight for his property, and Robles drove away, with Daly's legs protruding out of the window. In spite of his somewhat precarious position, Daly was apparently laughing, but some of the other occupants of the vehicle warned him that the situation was not funny, and one of the men threatened to "kick his butt," or worse.

Eventually, the car stopped and Daly maneuvered his way out and ran from the scene, leaving his jacket in the car. Soon all of the occupants of the vehicle except Robles were running after him, with two of the men apparently in the lead. Daly asked for help from a cabdriver and, when that request turned out not to be productive, vaulted over the hood of the cab and solicited the assistance of a man who had just got out of his car. That man turned out to be Gary Vagnette, whose eventual identification of McCall is the subject of this appeal.

As Daly spoke to Vagnette, the vanguard of his tormentors caught up with him. One or more of the men beat and kicked him and demanded that he take off his boots; Daly did so and delivered them to the robbers. One of the young women—apparently Mary Cabrera—asked for and received Daly's wallet. The assailants then returned to their car. Vagnette called the police. Daly, who was bleeding and who had been involuntarily relieved of his jacket, boots and wallet less than a week after arriving in our nation's capital, managed to walk to his parents' home and also called for help. Police officers responded, the occupants of the vehicle were soon identified and apprehended,[2] and Grimes, McCall and Hyder were charged in a single indictment with armed robbery.[3] The weapon which they allegedly used is described in the indictment as a "shod foot." All three defendants, according to Daly, were wearing boots.

## II

The basic facts described above were largely undisputed at trial. There was considerable disagreement, however, as to the part played in the crime by the various defendants. Although it was undisputed that McCall, like his codefendants, was on the scene at the time that Daly was assaulted and robbed, his defense was essentially one of innocent presence.

The principal witnesses who testified at trial regarding the encounter included three of the occupants of the car (Robles, Ms. Ford, and Ms. Cabrera, the latter having been called to the stand by the defense), the victim (Daly), and a passerby (Vagnette). The testimony of these witnesses as to the role played by McCall was confusing and contradictory.

Robles, Ms. Ford and Ms. Cabrera all testified that it was Grimes who beat and kicked Daly and who took his boots. None of the three implicated McCall in the beating, the kicking, or the misappropriation of Daly's property. All three witnesses agreed that McCall was in the car when the encounter began and that he was one of those who ran from the car after Daly left it; Ms. Cabrera claimed to believe that McCall was following Grimes rather than chasing Daly. The two women asserted that McCall was simply standing around away from the action during the assault; Robles said McCall was next to Grimes. Ms. Cabrera was impeached with a prior inconsistent statement to a prosecutor in which she had apparently inculpated McCall; she claimed that she was too drunk when she made that statement to know what she was saying, an assertion rebutted by a police officer.[4]

2. The initial apprehension related to another assault and robbery which occurred a few days later and in which the three defendants were also charged. McCall is presently serving a sentence of no less than ten years and no more than thirty years as a result of his conviction in the second case.

3. The same indictment charged Mary Cabrera with robbery in connection with Daly's wallet. Ms. Cabrera was not, however, prosecuted by the United States.

4. Grimes, as I have noted, identified McCall and Hyder in his confession. The confession was admitted against him but redacted to avoid hearsay problems. *See generally Bruton v. Unit-*

Daly identified McCall at trial as the person who chased him, kicked him, and took his boots.[5] Daly was, however, impeached with his responses to prior identification procedures. Approximately ten days after the crime, officers showed Daly an array of eight color photographs which included the three defendants. He quickly selected a photograph of Grimes and identified him as his "primary" assailant. He also selected McCall's photograph. A police detective testified, however, that a few weeks later Daly had stated at a witness conference that "the first photograph that he had pulled from the array was the primary assailant, that being the one that did most of the activity or chased him or assaulted him [and] took his boots." That man, of course, was Grimes, and Daly's statement was, in this respect, consistent with those of Robles, Ms. Ford and Ms. Cabrera.

On November 2, 1988, about seven weeks after the robbery, police officers showed Daly a videotape of a lineup. Daly watched the videotape five times. He eventually described Grimes as "possible"[6] but said that No. 2 (McCall) did not "ring a bell." On the fifth and final viewing, Daly stated categorically that No. 2 was not one of his assailants.

### III

Gary Vagnette testified that although he was the person who placed the 911 call which first alerted police to the incident, he was not interviewed until May or June 1989, eight or nine months after the robbery. He stated that he saw two men chase and rough up a third, and that immediately before the assault the victim had said something to him which he did not understand. He described a blond man as having kicked the victim and a second man as perhaps having participated in that activity.

At the conclusion of the direct examination of Vagnette, the prosecutor asked to approach the bench. A sidebar conference ensued:

MR. FRIEDMAN (the prosecutor): I should have thought to do this before the jury came in, I'm sorry. The question I contemplated asking [Mr. Vagnette] is something to the effect of do you think you would recognize any of the people if you saw them again. And I expect that his answer will be, no, I don't. I can't guarantee that's his answer because I never had him looking at them.

MR. NIBLACK (counsel for McCall): I was informed before the trial that Mr. Friedman was not going to ask him to make any in-court identifications.

THE COURT: Well, is that right?

MR. FRIEDMAN: Well, whatever I said was said in court and I—and *I think I did say that.* And I'm not asking him in order to get an in-court identification. I'm asking him because I guess I want the jury to understand that the reason he's not being asked is too much time's passed.

MR. NIBLACK: I would submit, Your Honor, there was opportunity to show him the line-up video tape, there was opportunity to show him the line-up photograph, there was opportunity for him to show the photo array and it wasn't done.

THE COURT: How is your client prejudiced, Mr. Niblack?

MR. NIBLACK: Because he'll pick him out in the courtroom. It's an unfair line-up. It's a completely suggestive line-up. Not even a line-up, it's a suggestive opportunity for him to—

THE COURT: There's not any law that supports that proposition at all. All the law in this area was that absent any suggestivity other than the courtroom situation itself—

*ed States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

**5.** Daly testified that Grimes looked "familiar" and was probably one of the men in the back of the car; he did not recognize Mark Hyder.

**6.** "I always want to stop when I see that face."

MR. NIBLACK: I ask other people be permitted to sit in the courtroom with my client, with the other defendants.

THE COURT: Excuse me?

MR. NIBLACK: Then I ask that the Court and police department, U.S. attorney's office provide other people that are similar to sit in the courtroom and provide us a fair opportunity for a line-up.[7]

THE COURT: No, sir.

MR. NIBLACK: There is a law that says that is favored.

THE COURT: Why?

MR. NIBLACK: There is case law that says that that type of arrangement is favored upon request.

THE COURT: What's the case law?

MR. NIBLACK: On the other hand, he has only viewed the defendant in the courtroom setting. There are three defendants in this case and asking him to make an in-court identification when I was informed by Mr. Friedman when this case started that there was to be no identification—in-court identification—

THE COURT: That's why I asked you how you are prejudiced, because I can't conceive of any basis on which you could move to suppress such as identification based on the testimony I've heard. And if you can tell me some basis or what you would have done had Mr. Friedman told—

MR. NIBLACK: First of all, when there is an opportunity to provide identification, it should be under as fair a circumstance as possible. And this is patently unfair. They had the opportunity to show him the photo array, the opportunity to show him the photograph of the line-up, they had the opportunity show him the video tape of the line-up and they didn't do it. Now under the most favorable circumstances, the most suggestive circumstances they ask him to do it.

After further discussion concerning whether any case law existed on counsel's point, the court overruled the objection:

THE COURT: You [referring to Mr. Niblack] can show that he was never asked to go to a line-up, never shown any photos, that the government just did this because it happens to have all three of these people here in court together. But I don't know of any law that says Mr. Friedman can't do it.

Now if you have some basis to—that you would have moved to suppress it because it's—you know, there was some suggestivity before trial leading up to it, then I'd hear you but you don't have any basis for that.

MR. NIBLACK: There may be other things he didn't testify, Mr. Friedman didn't ask him, [which] *Mr. Friedman knows we could have explored at pretrial motions.*

THE COURT: That's purely speculative. I'll overrule your objection.

(Emphasis added.)

After the judge's ruling, the prosecutor asked the witness whether "at this time you would recognize any of the people that you saw that night if you saw them again." Vagnette responded that "with less than a hundred percent vivid recollection," [8] he could state that "the young blond man there [McCall] certainly fits my recollection." On cross-examination by counsel for the codefendants, Vagnette indicated that the blond man was one of the first two pursuers who chased and kicked Daly.[9] On redirect examination, Vagnette revealed that he had observed McCall standing near the courtroom before he testified, and that "I said to myself that this is the main defendant or this is one of the defendants in this case." Daly elaborated that the blond man "was always the main person to

7. Since the witness had already seen McCall at the defense table, it is questionable whether this proposal could have accomplished its intended purpose.

8. Vagnette stated that the blond man was four inches taller than he remembered him but that "his face does fit my recollection."

9. Vagnette's testimony on the subject of what McCall did was at first somewhat unclear, and a juror sent a note to the judge inquiring whether Daly had testified that McCall was the person who kicked the man on the ground. With the consent of all counsel, the judge instructed the jurors that they would have to rely on their own recollection.

me, the person who came around first, the person who was most aggressive, and the only person with whom I had eye contact." He indicated that his identification was not based solely on McCall's presence at the defense table.

The following day, after Vagnette had completed his testimony, McCall's counsel made a motion for a mistrial. He now contended that McCall had been denied his right to counsel in connection with Vagnette's "second sighting" of him outside the courtroom, because the prosecutor's assurance that there would be no identification by Vagnette lulled counsel into failing to take the necessary steps to avoid the second sighting:

> Here, as far as Mr. Vagnette was concerned, I was informed by the government at the beginning of trial that there would be only one in-court identification attempted and that was from the complaining witness. I was informed that Mr. Vagnette would not be asked to attempt to make an in-court identification ... I myself not knowing that there was a danger of this confrontation between the defendant and Mr. Vagnette *was able to take no precautions to avoid it. And I would have, had I known there was that danger ...* (but) I was led to believe by the Government that there would be no attempt at an in-court identification.

The judge denied the motion for a mistrial, and the case was eventually submitted to the jury. Grimes, who fled midway through the trial, was convicted *in absentia* of armed robbery. He was sentenced to imprisonment for no less than seven years and no more than twenty-one. McCall was found guilty of the lesser included offense of simple assault.[10] He was committed for one year pursuant to the District of Columbia Youth Rehabilitation Act. D.C.Code § 24–803(b) (1989). Hyder was acquitted of all charges. McCall filed a timely notice of appeal.

**10.** The jury was unable to reach a verdict as to McCall with respect to the charge of armed

## IV

### A. The prosecutor's assurance.

Identity was and was not a critical issue at McCall's trial. On the one hand, all of the witnesses who were involved in the September 14, 1988 incident testified both that McCall was one of the back seat passengers in Arnold Robles' car and that he was present at the conclusion of the chase, when Michael Daly was assaulted by his pursuers and stripped of his boots. On the other hand, the "involved" witnesses agreed that McCall was merely standing by, watching, when Daly was assaulted, and that it was Grimes, acting on his own, who struck Daly in the head, kicked him as he lay on the sidewalk, and ordered him to remove his boots. All three of the defendants' companions—Deirdre Ford, Mary Cabrera, and Arnold Robles—identified Grimes as the primary and, indeed, the only assailant. Ms. Ford and Ms. Cabrera gave testimony which was strongly exculpatory as to McCall and consistent with a defense of mere presence; Robles stated that McCall (like Hyder, who was acquitted) was merely standing close by when Grimes struck his victim from behind. If the three witnesses who knew McCall—Ms. Ford, Ms. Cabrera and Robles—had been the only identifying witnesses at the trial of this case, McCall might well have been acquitted of all charges, including simple assault.

McCall's "mere presence" defense was seriously undermined, however, by the courtroom identifications by Daly and Vagnette. He was, of course, a stranger to both of these witnesses, but each identified him at trial as the man who first set upon Daly, knocked him to the ground, and proceeded to kick him into submission. These in-court identifications were devastating to McCall, for they undermined his claim that he was a mere bystander who followed Grimes to the scene of the crime but did not participate in or assist in any way the ensuing robbery and assault.

robbery.

McCall had a ready arsenal with which to combat Daly's in-court identification. Daly had previously seen him in a photo array and lineup video, and, on those occasions, had either eliminated him as a suspect or, in the case of the photo array, selected his picture but indicated that Grimes, not McCall, was definitely the primary assailant. McCall was in a position to argue quite plausibly that Daly's in-court identification of him as the main assailant was erroneous and that his trial testimony, given nearly a year after the offense, was less reliable than his earlier statements.

In the case of Vagnette, however, McCall had no such ammunition. The prosecutor, who had a photo array, lineup photo, and lineup videotape readily at hand, had not bothered to show any of these materials to Vagnette. Rather, he effectively ambushed McCall by securing an in-court identification after Vagnette was already on the witness stand, at which time it was too late to arrange a fair confrontation. The ensuing identification by an uninvolved bystander witness whose testimony the jury was likely to credit was a devastating blow from which McCall never recovered.

McCall argues that Vagnette's in-court identification of McCall should have been excluded, not because the surrounding circumstances were impermissibly suggestive, but because the prosecutor had assured McCall's counsel before trial that no such identification would be elicited. "[A]ll members of the court appear to agree that a criminal defendant is entitled to all available information necessary to make an informed decision whether a[n] ... identification is subject to effective challenge." *In re F.G.*, 576 A.2d 724, 728 (D.C.1990) (en banc).[11] Although McCall concedes that the prosecutor was not strictly obliged under Super.Ct.Crim.R. 16 to tell defense counsel what identifications he intended to elicit—a concession that might reasonably be questioned in light of the quoted pronouncement in *F.G.*—he contends that, once the prosecutor chose to reveal such information, he had an obligation not to mislead but to provide accurate information. I agree.

McCall's counsel had the right to rely on the prosecutor's representation. *Rosser v. United States*, 381 A.2d 598, 605 (D.C.1977). Although McCall accuses the prosecutor of deliberate wrongdoing, I have no reason to believe that the prosecutor intentionally deceived defense counsel. It appears more likely that he made an improvident commitment which he later regretted.[12] In any event, he proceeded quite correctly by seeking the judge's permission to ask his proposed final question instead of proceeding without the judge's consent. There can be no doubt, however, that the prosecutor, at the very least, "threw defense counsel ... off the track." *Id.*

The government suggests that the prosecutor did not violate any "agreement" because there was no "agreement" *per se*, and suggests that defense counsel should have prepared for the possibility of a courtroom identification by Vagnette in any event. I think that a more generous and expansive view of a prosecutor's obligation is called for in circumstances such as these. "We cannot agree that defense counsel was obliged to doubt, and thus test, the prosecutor's word...." *Rosser, supra,* 381 A.2d at 608. But for the prosecutor's assurance that he would not seek an in-court identification by Vagnette, the defense's "trial preparation and strategy might well have been different." *Smith v. United States*, 491 A.2d 1144, 1149

---

11. In *F.G.*, the issue concerned a showup identification, but the court's language applies *a fortiori* to a courtroom identification. Unlike a courtroom situation, "an immediate on-the-scene identification has uniquely powerful indicia of reliability which more than counterbalance any suggestivity, absent special elements of unfairness." *In re B.E.W.*, 537 A.2d 206, 207 (D.C.1988) (quoting *Singletary v. United States*, 383 A.2d 1064, 1068 (D.C.1978)).

12. That the prosecutor was not shown to have engaged in intentional wrongdoing does not, however, lessen the prejudice to McCall. "It is of no consolation to an individual denied [his rights] that it was done in good faith." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). To be sure, *Burton* dealt with equal protection principles, but I think the point is nevertheless apropos.

(D.C.1985) (citation and internal quotation marks omitted).[13]

Although the trial judge made no specific finding as to whether the prosecutor had provided an assurance as claimed by McCall's attorney,[14] he based his ruling on the absence of any showing of prejudice. *Cf. Lee v. United States*, 385 A.2d 159, 164 (D.C.1978) (government's failure to make discovery requires reversal only if it is "substantially prejudicial" to the appellant's rights). The judge implicitly recognized that if the identification would substantially prejudice McCall, it should be excluded. I therefore turn to the issue of prejudice.

### B. Prejudice.

If McCall's attorney had been apprised that Vagnette would be given the opportunity to identify him in the courtroom, he could have taken a number of measures to counteract this possibility. In fact, apparently and justifiably relying on the prosecutor's contrary assurance, he took none of them.

Unlike Daly, Vagnette was never shown either a photo array or the videotape of a lineup, nor was his ability to make an identification in a non-suggestive setting ever tested in any other way. Absent the prosecutor's improvident assurance, this omission on the part of the prosecutor and the police could have been effectively remedied by the defense. McCall's attorney could have asked an investigator to prepare his own photo array and present it to Vagnette; the investigator could then have testified to the results. Counsel could also have requested a lineup. *See Berryman v.*

*United States*, 378 A.2d 1317, 1319–20 (D.C.1977). Indeed, "[i]f the Government's case turns upon the testimony of an identification witness, and defense counsel forecasts irreparable suggestivity if the witness appears at the preliminary hearing, his remedy lies in a motion for a lineup, to assure that the identification witness will first view the suspect at a lineup rather than in the magistrate's hearing room." *United States v. Smith*, 154 U.S.App.D.C. 111, 113, 473 F.2d 1148, 1150 (1972). Given the timing of the prosecutor's change of direction, however, it was far too late for the defense to obtain a lineup, and counsel's request at the bench for an improvised one was futile under the circumstances.

McCall could also have filed a motion to suppress any courtroom identification by Vagnette as unduly suggestive and unreliable. *See In re F.G., supra.* Indeed, he did file such a motion, albeit an unsuccessful one, with regard to Daly's identification of him. To be sure, this court has held that there is nothing inherently improper about an in-court identification, so that even a witness who has failed to make an out-of-court identification may be brought into court and permitted to identify the defendant from the stand. *See, e.g., Middleton v. United States*, 401 A.2d 109, 131 (D.C.1979). Nevertheless, McCall would have had a right to an evidentiary hearing if he had filed a motion to suppress identification testimony. *In re F.G., supra,* 576 A.2d at 728. Even assuming, as did the trial judge, that such a motion would not have been successful,[15] McCall's ability to

---

**13.** I cannot agree with the government's contention that there was no breach of the prosecutor's assurance because the prosecutor subjectively believed that Vagnette would not identify McCall. First, the prosecutor had no basis for a belief either that Vagnette could or could not make an identification, for Vagnette had never been asked to do so. McCall's attorney turned out to be a far better prognosticator when he predicted that Vagnette would identify his client in the suggestive context of the courtroom. Moreover, since it was the prosecutor who had made the commitment, it was his obligation to eschew any course of conduct which would result in its breach. If he was unsure of what Vagnette would say, the prosecutor could have

requested that the testimony be taken initially outside the presence of the jury.

**14.** The prosecutor never denied giving such an assurance, and the judge apparently assumed that defense counsel's claim was correct.

**15.** In *F.G.*, this court held that a defendant was presumptively entitled to an evidentiary hearing on a motion to suppress a prompt showup identification by an undercover officer in a drug distribution case, even though the trial court had noted that the Public Defender Service attorneys and other defense counsel were unaware of a single case in which a comparable

cross-examine Vagnette might well have been substantially enhanced following a motions hearing.

Finally, if McCall's counsel had been apprised that Vagnette was a potential identification witness, he would have been in a position to advise his client, so far as possible, to keep out of sight, and thus to try to avoid a second sighting [16] by Vagnette which might pave the way for, and reinforce, a courtroom identification. This court has held that a defendant may waive his presence at a pretrial hearing on a motion to suppress identification testimony. *Singletary, supra,* 383 A.2d at 1070. By analogy, McCall could have requested the judge to permit him to absent himself while Vagnette was in the courtroom, at least until such time as a non-suggestive identification procedure could be arranged. All in all, the prosecutor's assurance and subsequent failure to honor it effectively deterred McCall and his counsel from taking an assortment of tactical steps which had the potential for improving McCall's chances of successfully resisting this prosecution.

## C. The standard of review.

When the prosecutor approached the bench and asked the judge to permit him to pose the critical question to Vagnette, defense counsel objected with considerable vehemence. He did not, however, have at his fingertips all of the arguments which McCall's appellate attorney has now presented to this court. Indeed, trial counsel's main point appeared to be that an in-court identification was itself improper when the prosecutor had not attempted less suggestive procedures—a contention which, as the trial judge correctly held, finds no support in our cases. I agree that much of trial counsel's improvised argument, *see* pages 954–955, *supra,* was essentially unpersuasive. "[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989). Given the character of the contemporaneous articulation of the defendant's position, the "plain error" doctrine could conceivably be invoked.

It is fair to say that some of the refinements of the prejudice which McCall now

---

motion had been granted. *See In re Frank G.,* 113 Daily Wash.L.Rptr. 1445, 1451 & n. 3 (Super.Ct.D.C.1985), *rev'd sub nom. In re F.G., supra.* The lack of any appreciable prospect that the motion to suppress would be granted was held not to affect the respondent's right to an evidentiary hearing.

A courtroom identification is just as suggestive as and, in light of the passage of time, far less reliable than a prompt showup. *See People v. Gow,* 65 Ill.App.3d 723, 728, 22 Ill.Dec. 353, 357, 382 N.E.2d 673, 677 (1978) (three eye-witnesses identified as robber a model made up to look like defendant; court noted that "defense counsel's point about the unreliability of in-court identification has substance"). *See also* Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 STANFORD LAW REVIEW 969, at n. 3 (1977), (citing *Time,* April 2, 1973 at 59), in which the author relates that

[a] judge in New York City developed his own system to check on the frequency of mistaken identifications. In ten cases in which the identification of the accused was virtually the only evidence, the judge permitted defense attorneys to seat a look-alike alongside the defendant. In only two of the ten cases was the witness able to identify the defendant.

Moreover, there are readily available alternatives to restricting identification procedures to a

courtroom identification (*e.g.* by arranging a photo array and a lineup), whereas a prompt showup immediately after the commission of a crime is dictated by the necessities of the situation.

Under these circumstances, the holding in *F.G.* would have required the judge to grant an evidentiary hearing in this case if counsel had moved to suppress any courtroom identification. McCall goes further and maintains that he would have had an excellent prospect of prevailing on such a motion. I find this contention substantially more problematic, but its accuracy cannot be resolved on this record.

**16.** The majority's emphasis on the second sighting seems to me to ignore the reality that, if McCall's counsel had known Vagnette would be used as an identification witness, he could both have attempted to keep his client out of Vagnette's sight and to take a number of other steps to blunt the impact of any identification, including a second sighting. These steps could have included a request for a court-ordered lineup, or a confrontation of Vagnette by a defense investigator with a photo array, or a suppression motion at which Vagnette might or might not have testified. Some of these devices were effectively used to impeach Daly.

claims to have suffered were not meaningfully brought to the attention of the trial judge. *See Dixon v. United States,* 565 A.2d 72, 80 (D.C.1989) (discussing purpose of "plain error" rule).

McCall's counsel did, however, make the point to the judge that, but for the prosecutor's assurance, he could have moved to suppress any identification by Vagnette and might have taken other steps—including attempts to avoid a second sighting—to protect his client's interests. While he did not mention that he could have filed a motion for a lineup, he did ask that an improvised one be assembled in the courtroom, and he criticized the prosecution for not having previously asked Vagnette to attend a lineup. Counsel was understandably taken off guard by a completely unexpected denouement, namely, the request by the prosecutor for relief from a commitment on which the defense had reasonably relied. Under ordinary circumstances, an attorney would have had weeks to devise a strategy to combat an in-court identification. It would be unreasonable, in my opinion, to fault counsel or to penalize his client because the attorney failed to assemble and enumerate all of the effective arguments available to him in a short sidebar conference with the judge.

No man may profit from his own wrong. *Glus v. Brooklyn Eastern Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 761, 3 L.Ed.2d 770 (1959). Here, the prosecutor sprang a complete surprise on McCall's counsel, and the latter was placed in the position of being obliged without any warning to debate an issue for which he previously had no reason to prepare. I do not think that the plain error doctrine was devised for such a situation.

Eschewing plain error analysis, I view the question here presented as somewhat analogous to the determination whether sanctions ought to be imposed for a discovery violation and, if so, the nature of these sanctions. That determination is a discretionary one, and requires consideration of the reasons for the nondisclosure, the impact of the nondisclosure on the trial, and the impact of a particular sanction on

the administration of justice. *Lee, supra,* 385 A.2d at 163.

Considering the three factors enumerated in *Lee,* I am satisfied that there was no valid reason here for what was far more than the "nondisclosure" of the planned identification—a commitment not to seek one. The prosecutor's change of mind did not entitle him to break a promise on which McCall's counsel had a right to rely. From the perspective of the administration of justice, it is important for courts to require that the government keep its promises.

I am also persuaded that an unexpected courtroom identification, for which McCall was unprepared as a result of the prosecutor's earlier commitment, was inherently prejudicial to him. Although one can sympathize with the trial judge, whose ruling was made after McCall's counsel made largely unpersuasive contentions regarding the character of the prejudice, I am unable to agree with his decision. I cannot, of course, be certain that McCall would have been acquitted even if his attorney had been apprised of Vagnette's potential identification of McCall and had taken all reasonable steps to avert it. He might also have been convicted even if the identification evidence had been excluded. Certainty on these subjects, however, is not required.

Analogizing to the harmless error doctrine, the court must be satisfied "with *fair assurance,* after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed" by the breach of the prosecutor's commitment. *Giles v. United States,* 432 A.2d 739, 746 (D.C.1981) (emphasis added) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). Given the testimony of the three witnesses who knew him that McCall was not the main assailant (or, for that manner, not an assailant at all), and given the ammunition available to McCall to impeach Daly, a broken promise by the prosecutor which substantially impaired McCall's ability to contest Vagnette's identification of him may well have put the government over the top. At the very least, the contrary cannot be

maintained with the requisite "fair assurance." [17]

## V

For the foregoing reasons, I would reverse McCall's conviction and remand the case for a new trial.

---

**17.** McCall did not contest his presence on the scene. This case is therefore not quite like the more typical eyewitness identification dispute in which an arguably suggestive identification is matched against an alibi, or against some other comparable defense. Vagnette was undoubtedly right when he said that McCall was present when the crime was committed. If Vagnette had failed to select McCall from a lineup, then the most logical point to which such a failure would have been relevant, namely, whether Vagnette had ever seen McCall before, was not genuinely at issue in this case.

I do not view this atypical scenario, however, as disposing of the prejudice to McCall. If Vagnette had concluded, as Daly did when viewing the videotape of the lineup, that McCall was not one of the participants in the encounter, then this would surely have been relevant in the jury's mind in assessing Vagnette's recollection as to the specific role which McCall played.

I also recognize that while Giles was convicted of armed robbery, McCall was found guilty only of assault, so that the jurors may not have credited the testimony that McCall was the main assailant. Vagnette's testimony, on the other hand, was the only unimpeached evidence which depicted McCall as an active participant in the assault. Mark Hyder, who was not identified either by Vagnette or by Daly, was acquitted. Under these circumstances, we as an appellate court ought not to speculate whether the jury would have viewed the proof as to McCall as substantially more incriminating than the case against Hyder if Vagnette's identification of McCall had been excluded.